[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-11955
_____

D.C. Docket No. 1:16-cv-21976-DPG


CHECKER CAB OPERATORS, INC.,
a Florida Corporation, individually and on behalf of others similarly situated,
B&S TAXI CORP.,
a Florida Corporation,
MIADECO CORP.,
a Florida Corporation,

Plaintiffs - Appellants,

versus

MIAMI-DADE COUNTY,
a political subdivision of the State of Florida,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(August 6, 2018)

Before MARCUS and WILSON, Circuit Judges, and HOWARD,[*] District Judge.

MARCUS, Circuit Judge:

The emergence of Transportation Network Entities such as Uber and Lyft ("TNEs") has threatened the viability of traditional taxicab companies worldwide. Amid that competitive struggle, this appeal arises. For years, taxicab, livery, limousine, and other for-hire transportation services in Miami-Dade County ("the County") could be offered only by those who possessed a "medallion" -- that is, a license to supply those services. In May 2016, the County enacted an ordinance authorizing the TNEs to operate in the for-hire transportation market ("the TNE Ordinance"). Certain medallion holders filed suit ("the Medallion Holders"), attacking the TNE Ordinance's constitutionality. They claimed that, by disrupting their market exclusivity, the TNE Ordinance effected a "taking" of their medallions without just compensation in violation of the Takings Clause of the Fifth Amendment to the United States Constitution and Article X § 6 of the Florida Constitution. They also claimed that, because it subjected them to more stringent regulations than those governing TNEs, the TNE Ordinance discriminated against medallion holders in violation of the Equal Protection Clause. The district court held that the Medallion Holders failed to state either a takings or an equal protection claim.

---

[*] Honorable Marcia Morales Howard, United States District Judge for the Middle District of Florida, sitting by designation.

2

After the district court dismissed this case, the Florida legislature passed a new body of laws that preempted the TNE Ordinance, thereby mooting the Medallion Holders' claims for declaratory and injunctive relief. However, we affirm the judgment of the district court dismissing their claims for monetary damages arising under the Takings and Equal Protection Clauses, which were not moot. The medallions conferred by the County created a license to offer for-hire taxicab services in Miami-Dade County; the County did not afford the Medallion Holders the right to exclude competition in the marketplace. Moreover, the regulatory scheme was rationally related to improving the quality and safety of for-hire transportation service and was wholly consonant with the Equal Protection Clause of the Fourteenth Amendment.

## I.

## A.

The Medallion Holders -- Checker Cab Operators, Inc., B&S Taxi Corp., and Miadeco Corp. -- are for-hire taxicab license holders operating in the County. Since 1981, the County has extensively regulated its for-hire transportation market through the Miami-Dade County Code of Ordinances ("the Code"). It has imposed licensing requirements, fixed the overall number of licenses, restricted the licenses' alienability, promulgated rules of operation, capped fares and rates, and prescribed insurance requirements, vehicle standards, and penalties for Code violations. In

3

1998, the County adopted Ordinance No. 98-105 (the "1998 Ordinance") in order to improve the quality, reliability, and safety of for-hire transportation services. The 1998 Ordinance established the "medallion system," which renamed for-hire transportation licenses "medallions," deemed them "intangible property," and converted all 1,824 existing for-hire licenses into medallions for a fee. *Id*. §§ 31-81(z), (aa), 31-82(c). It also comprehensively conditioned the medallions' use and alienability. *Id*. § 31-82(j)–(k), (r). It decreed that the medallions may be transferred, sold, or assigned only to County-registered taxicab chauffeurs, and required medallion holders to keep records pertaining to vehicle operations, to register their vehicles with the County, and to make those vehicles available for inspection. *Id*. § 31-82(j), (r). Failure to abide by those rules could result in the suspension or revocation of a medallion. *Id*. § 31-82(k).

Since 1998, the County has amended its for-hire transportation regulations at least 33 times, while issuing almost 300 additional medallions, thereby increasing the total number of medallions by over 16 percent. Miami-Dade County, Fla., Ordinance Nos. 98-105 (Aug. 7, 1998); 01-67 (Apr. 20, 2001); 04-103 (Jun. 28, 2004); 06-111 (Apr. 20, 2006); 08-139 (Apr. 16, 2009); 11-53 (Dec. 13, 2011); 11-54 (Dec. 13, 2011); 12-51 (Jun. 26, 2012). Still, the County generally limited the total number of medallions in circulation. By maintaining their scarcity and permitting their alienability, the County nurtured a secondary market in

4

medallions. In 2012, the County profited handsomely from that market after auctioning off medallions for more than $400,000 each. By 2014, the medallions traded for approximately $340,000.

That same year, TNEs began operating in the County. They enabled customers to use smartphone applications to locate, schedule, and summon drivers, who transported them to their destination in exchange for a prearranged fee made by credit card payment through the application. Since TNEs provided for-hire transportation services in the County without medallions, those services were unlawful, and the County responded by ticketing TNE drivers and impounding TNE vehicles.

By 2016, however, the County reconsidered its TNE policy. It enacted the TNE Ordinance in order to authorize the TNEs' market entry and "promote the free market, enhance the availability, efficiency and safety of transportation systems as well as encourage innovation and enhance residents' and consumers' transportation options." Ordinance No. 16-42, Body. Although TNEs were required to bear TNE licenses, they were not obliged to carry medallions. *Id*. § 31-702(a). As a result of the TNE Ordinance, TNE operators entered the County en masse, substantially diluting the medallions' value. Also in 2016, the County modified taxicab regulations (the "2016 Ordinance") in order to "level the playing field [between taxicabs and TNEs] notwithstanding the unique aspects of each

5

form of transportation, and encourage competition under a responsible and fair regulatory regime." *Id*., Body. Following the promulgation of the TNE and 2016 Ordinances, regulations of taxicabs diverged in some ways from those imposed on TNEs.

In July 2017, the Florida legislature enacted a new law regulating TNEs at the state level. Act effective July 1, 2017, ch. 2017-12, Laws of Fla. (codified at Fla. Stat. § 627.748 (2018)). That law preempted the TNE Ordinance, declaring: "It is the intent of the Legislature to provide for the uniformity of laws governing [TNEs], [TNE] drivers, and [TNE] vehicles throughout the state. [TNEs], [TNE] drivers, and [TNE] vehicles are governed exclusively by state law, including in any locality or other jurisdiction that enacted a law or created rules governing [TNEs], [TNE] drivers, or [TNE] vehicles before July 1, 2017." Fla. Stat. § 627.748(15)(a). It did not however preempt local laws covering airports and seaports. *Id*. § 627.748(15)(b).

In addition to preempting local laws, the new state law regulated TNE insurance coverage and driver eligibility, and required TNEs to, *inter alia*, disclose fares before commencing rides, display photographs of TNE drivers and license plate numbers of TNE vehicles, and transmit electronic receipts listing the ride's origin and destination, the total time and distance traveled, and the total fare paid. *Id*. § 627.748(4)–(6). The law also prescribed insurance and driver-eligibility

6

requirements. *Id*. § 627.748(7), (11). As a result, the County's TNE industry is now comprehensively governed by state law.

B.

In June 2016, the Medallion Holders filed an amended class action complaint on behalf of all medallion holders in the Eleventh Judicial Circuit in Miami-Dade County. They alleged that the TNE Ordinance effected a "taking" of their medallions without just compensation in violation of the United States and Florida Constitutions. Specifically, "[t]hrough the [TNE] Ordinance, the County has substantially interfered with the private property held by the [Medallion Holders] in that their [medallions] will be, and are, significantly devalued as a result of the legalization and/or regulation of the [TNEs]." They requested just compensation for the diminution of the medallions' value.

The Medallion Holders also claimed that the TNE Ordinance subjected similarly situated service providers -- taxicabs and TNEs -- to disparate regulatory frameworks, which competitively disadvantaged the Medallion Holders and violated their right to the equal protection of the laws. They cited six particular discrepancies between taxicab and TNE regulations: (1) while the Code required taxicabs to secure chauffeur's agreements with each taxicab driver, it granted TNEs broader latitude in hiring drivers; (2) the Code imposed more stringent insurance coverage requirements on taxicabs; (3) the Code subjected taxicabs to

7

background checks by the Department of Regulatory and Economic Resources ("the Department"), while permitting TNEs to conduct independent background checks; (4) while taxicabs were required to undergo Department vehicle inspections, TNEs were permitted to perform independent inspections; (5) taxicabs were bound by more onerous vehicle-appearance standards; and (6) the County established maximum fare rates for taxicabs, but not for TNEs. The Medallion Holders argued that those regulatory disparities were "not rationally related to legitimate government interests," but rather were "irrational and wholly arbitrary." They sought monetary damages, a declaration that the TNE Ordinance violated their right to equal protection, and an injunction against its enforcement.

The County removed the case to the United States District Court for the Southern District of Florida and moved to dismiss the complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). The district court agreed. First, the court held that the Medallion Holders failed to state a takings claim. Although the medallions enabled their holders to provide for-hire transportation services, they conferred no right to block competition in the relevant market. Since the diminution of the medallions' value derived solely from exposure to new competition, their takings claims could not succeed. The trial court also rejected their equal protection claims, explaining that the regulatory distinctions identified by the Medallion Holders simply reflected the important differences found in the

8

taxicabs' and TNEs' respective business models. Thus, for example, while taxicabs operate primarily through street hails and flat fare rates, TNEs are summoned through smartphone applications and calibrate fares according to fluctuations in supply and demand. The district court further denied the Medallion Holders' request for leave to amend their complaint, holding that any amendment would be futile.

This timely appeal ensued.

## II.

"We review the district court's grant of a motion to dismiss for failure to state a claim *de novo*, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff. To withstand a motion to dismiss under Rule 12(b)(6), a complaint must include enough facts to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016) (quotations and citations omitted).

We begin by addressing whether the claims have become moot in light of preemptive state law. Next, we discuss the Medallion Holders' takings claims. Finally, we assess their equal protection claims.

9

A.

The Medallion Holders argue, and the County does not dispute that Section 627.748, Florida Statutes (2018) does not moot this appeal even though it preempted the TNE Ordinance. It is well established that "[u]nder Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies." *Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs*, 868 F.3d 1248, 1255 (11th Cir. 2017) (en banc). In order to invoke the jurisdiction of an Article III court, "a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Id*. That injury "must be extant at all stages of review, not merely at the time the complaint is filed." *Id*. If the injury ceases, or is rendered unamenable to judicial relief, then the case becomes moot and thereby incapable of further Article III adjudication. *Id*. ("[E]ven a once-justiciable case becomes moot and must be dismissed when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.").

Typically, "[w]hen a party challenges a law as unconstitutional and seeks [ ] declaratory and prospective injunctive relief, a superseding statute or regulation moots [the] case . . . ." *Crown Media, LLC v. Gwinnett Cty.*, 380 F.3d 1317, 1324 (11th Cir. 2004) (quotations omitted). The reason is straightforward. When a challenged law is preempted, it cannot inflict further injury redressable by

10

declaration or injunction. *See Flanigan's*, 868 F.3d at 1255; *Adler v. Duval Cty. Sch. Bd.*, 112 F.3d 1475, 1477 (11th Cir. 1997) (describing declaratory and injunctive relief as "prospective"). Since declaratory and injunctive relief under these circumstances would be futile, they could not issue from an Article III court. *See Hispanic Interest Coal. of Ala. v. Governor of Ala.*, 691 F.3d 1236, 1243 (11th Cir. 2012) (mooting appeal due to preempted claim); *Griffith v. Gen. Motors Corp.*, 303 F.3d 1276, 1282 n.6 (11th Cir. 2002) (same); *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 799 (5th Cir. 1999) (same); Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3533.6 n.17 (3d ed.) (in light of superseding law, "[i]t would be pointless to enjoin enforcement of a policy no longer in effect"). When claims for declaratory and injunctive relief are mooted, "we do not consider the merits presented, but instead vacate the judgments below with directions to dismiss even if a controversy did exist at the time the district court rendered its decision." *Coal. for the Abolition of Marijuana Prohibition v. Atlanta*, 219 F.3d 1301, 1309–10 (11th Cir. 2000).

"Although a case will normally become moot when a subsequent [law] brings the existing controversy to an end, when the plaintiff has requested damages, those claims are not moot." *Covenant Christian Ministries, Inc. v. City of Marietta*, 654 F.3d 1231, 1244 (11th Cir. 2011) (quotations and citations omitted). Unlike claims for declaratory and injunctive relief, which are inherently

11

prospective in nature, "a claim for money damages looks back in time and is intended to redress a past injury." *Adler*, 112 F.3d at 1477. Because an "appellant['s] claim for money damages does not depend on any threat of future harm, [the] claim remains a live controversy." *Id.* at 1478; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 371 (1982) ("Given respondents' continued active pursuit of monetary relief, this case remains definite and concrete, touching the legal relations of parties having adverse legal interests.") (quotations omitted).

At the outset of this lawsuit, the Medallion Holders sought declaratory and injunctive relief for their equal protection claims. They also requested damages for both their takings and equal protection claims. All of the allegations were exclusively directed at the County's TNE Ordinance. Yet three months after the district court dismissed this case, the Florida legislature enacted Section 627.748, which preempted the TNE Ordinance. The Medallion Holders do not dispute the preemptive effect of the Florida statute. Since it has been preempted by state law, the TNE Ordinance is incapable of sowing future harm, mooting the Medallion Holders' claims for declaratory and injunctive relief. *See Flanigan's*, 868 F.3d at 1255. Consequently, we are obliged to vacate the judgment of the district court dismissing the Medallion Holders' claims for declaratory and injunctive relief on the merits and remand with instructions to dismiss for lack of subject matter

12

jurisdiction. *Coal. for the Abolition of Marijuana Prohibition*, 219 F.3d at 1309–10.

However, because the Medallion Holders also sought damages for their takings and equal protection claims, those claims are not moot. *Covenant Christian Ministries*, 654 F.3d at 1244; *Adler*, 112 F.3d at 1478. The prospect of recovering retrospective (monetary) relief for injuries allegedly inflicted on them by the County ensures a live controversy between the parties. We turn, therefore, to the merits of those claims.

B.

The Medallion Holders say that the district court erroneously dismissed their takings claims because they lacked a property right in excluding competitors from the relevant market. It is undisputed that the Code characterized the medallions as "intangible property" and, before the TNE Ordinance's passage, conditioned the provision of for-hire transportation services on the possession of a medallion. The Medallion Holders conclude that the Code vested in them "a legally protectable property right in exclusive provision of for-hire transportation services in Miami-Dade County." They urge that the County "took" their right to market exclusivity without just compensation by permitting TNEs to operate as competing for-hire transportation service providers.

13

The Medallion Holders frame their takings claims under both the United States and Florida Constitutions. Florida's courts have interpreted the Takings Clause of its Constitution "coextensively" with the Takings Clause of the Fifth Amendment. *St. Johns River Water Mgmt. Dist. v. Koontz*, 77 So. 3d 1220, 1222 (Fla. 2012), *rev'd on other grounds*, 570 U.S. 595 (2013). We therefore apply the same analysis to both claims.

"[T]o state a Takings claim under [federal] law, a plaintiff must first demonstrate that he possesses a 'property interest' that is constitutionally protected. Only if the plaintiff actually possesses such an interest will a reviewing court then determine whether the deprivation or reduction of that interest constitutes a 'taking.'" *Givens v. Ala. Dep't of Corr.*, 381 F.3d 1064, 1066 (11th Cir. 2004) (citations omitted). "[W]e are mindful of the basic axiom that property interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001 (1984). That independent source must establish that the plaintiff has a "legitimate claim of entitlement" on which he may reasonably rely. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). If the asserted property interest is created entirely by state statutory law, then it follows that the scope of the right

14

would be gleaned from the statute itself. *See, e.g.*, *id.*; *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538–39 (1985).

It is undisputed that the Medallion Holders own an intangible property interest in their medallions. We must decide whether that interest includes the right to market exclusivity. If the Code did not convey to the Medallion Holders the right to block competition in the for-hire transportation market, then the County could not have "taken" that right and the Medallion Holders' takings claims must fail. Even the most cursory examination of the Code reveals that the County did not give the Medallion Holders the right to enjoin competition. None of the Code's provisions ever explicitly or implicitly conferred that right. Instead, the Code reflects the carefully cabined scope of the Medallion Holders' intangible property interest. Moreover, the right to property does not ordinarily encompass the power to exclude competition, and nothing in the Code signaled a contrary intent.

The Code delineated the rights conveyed. The 1998 Ordinance defined a "medallion" as "an annual, renewable license issued pursuant to this Article which authorizes the provision of for-hire transportation services and," notably, "which may expire, be suspended or revoked." Miami-Dade County, Fla., Ordinance No. 98-105, § 31-81(r), (z) (Aug. 17, 1998). The medallions conveyed only a property interest in providing taxicab services in Miami-Dade County -- not in barring competitors. *See Joe Sanfelippo Cabs, Inc. v. City of Milwaukee*, 839 F.3d 613,

15

616 (7th Cir. 2016) ("The taxi permits issued by the Milwaukee city government are property, but have not been 'taken,' as they do not confer on the holders a property right in, amounting to control over, all transportation by taxi and taxi substitutes (such as Uber) in Milwaukee."). Quite simply, the Code furnished no basis for the Medallion Holders' assertion that they were entitled to, or could reasonably rely on a competition-free marketplace. *See Roth*, 408 U.S. at 578.

Indeed, the medallions were heavily regulated and narrowly circumscribed by County law. The Code regulated medallion holder entry and renewal; the number of medallions in circulation; the issuance of additional medallions; taxicab-driver eligibility; rules of operation; transfers, sales, bequests, and forfeiture of medallions; fares and rates; insurance requirements; vehicle standards and inspections; vehicle age; suspension and revocation of licenses; and penalties for violations. *See generally, e.g.*, Ordinance No. 16-43 (May 20, 2016). These pervasive restrictions in no way revealed an intent to imbue the medallions with monopoly power. *See Ruckelshaus*, 467 U.S. at 1006–07 (because plaintiff participated in an industry that had "long been the source of public concern and the subject of government regulation," it could not reasonably expect to operate free from regulations that constricted the scope of its property interests). The medallions granted only the right to operate taxicabs.

16

The Code's designation of the medallions as "intangible property" does not suggest otherwise. "Property" typically entails the right to possess, use, and dispose of that which one owns. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) ("Property rights in a physical thing have been described as the rights to possess, use and dispose of it.") (quotations omitted). However, ordinarily, "'[p]roperty' does not include a right to be free from competition." *Ill. Transp. Trade Ass'n v. City of Chicago*, 839 F.3d 594, 596 (7th Cir. 2016); *see also* Richard A. Epstein, *Takings: Private Property and the Power of Eminent Domain* 112 (1985) ("As a constitutional matter, one end that falls outside the scope of the takings clause is the redress of competitive losses that are not actionable in principle at the instance of the aggrieved victims."). The Code's characterization of the medallions as "intangible property" permits the Medallion Holders to possess, use, and dispose of their medallions -- that is, their right to operate in the for-hire transportation market -- subject to constraints imposed by the County. It does not remotely imply, however, that they may exclude competitors from entering that market.

The Medallion Holders stress that, before the enactment of the TNE Ordinance, the County permitted only medallion holders to provide for-hire transportation services, and generally restricted the overall number of medallions in circulation. They argue that their exclusive privilege to operate in the market

17

between 1998 and 2016 created a reasonable expectation of, and thus a property right to monopoly power in perpetuity. Again, an examination of County law and practice suggests quite the opposite.

For starters, any expectation of exclusivity was unreasonable. "[I]n the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [an owner] ought to be aware of the possibility that new regulation might even render his property economically worthless." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027–28 (1992). Miami-Dade County notified all medallion holders that any market exclusivity could be eliminated by regulation. When the County established the medallion system, it explicitly reserved the prerogative to "authorize . . . additional for-hire licenses . . . with such modifications or upon such terms and conditions as in *its* judgment the public convenience and necessity may require." Ordinance No. 98-105, § 31-82(e) (emphasis added). And since that time, the County has issued some 300 new medallions. Miami-Dade County, Fla., Ordinance Nos. 98-105 (Aug. 17, 1998); 01-67 (Apr. 20, 2001); 04-103 (June 28, 2004); 06-111 (Apr. 20, 2006); 08-139 (Apr. 16, 2009); 11-53 (Dec. 13, 2011); 11-54 (Dec. 13, 2011); 12-51 (June 26, 2012). The County repeatedly exercised its express authority to issue new medallions, and the Medallion Holders concede that they were powerless to exclude competition from fellow taxi drivers. Likewise, we do not see how they

18

reasonably could have expected to retain the right to block new entrants into the market. *See Ill. Transp. Trade Ass'n*, 839 F.3d at 597.

Moreover, the main purpose behind the County's medallion policy was not to enrich medallion holders, but rather to enhance consumer welfare. The County sought to "license and regulate the use of [for-hire transportation] vehicles to assure the passengers thereof, as well as others utilizing the streets of Miami-Dade County, that the vehicles are fit and that their operators and chauffeurs are competent to provide such services," and "to improve the quality, efficiency and economy of for-hire [transportation] service." Ordinance No. 00-139 (Dec. 14, 2000). The County hoped that the medallion system would serve as "an incentive for the taxi driver, who frequently constitutes a traveler's first and last impression of Miami-Dade County, to provide courteous, safe and efficient transportation service" in a very busy tourist destination. Ordinance No. 98-105. It was entirely foreseeable that the County might erode those restrictions if consumer welfare (and demographic changes) demanded it. Once "new technologies, including [TNE] reservation and dispatch applications for wireless devices [were] developed to permit . . . more efficient reservation, dispatch, payment and utilization of for-hire vehicles," the Medallion Holders should have anticipated that the County would authorize the TNEs' market entry in order to benefit consumers, particularly since they have "become extremely popular across the United States." Ordinance No.

19

16-42. The Medallion Holders' claim to a perpetual monopoly based on historical exclusivity is unpersuasive.

The Medallion Holders also insist that their designation as "intangible property" necessarily entails the "right to exclude others," which is "'one of the most essential sticks' in the bundle of rights that make up 'property.'" While the right to exclude is a corollary of the right to possess, a property holder may exercise the right to exclude only respecting his own property. *See Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978). The Medallion Holders may exclude others from possessing, using, or disposing of *their* medallions. But the "right to exclude" does not sanction the creation of a market stranglehold.

Similarly, the Medallion Holders cite to their right to freely alienate their medallions. Again, the argument sweeps too broadly. While the right to alienability is commonly associated with property, blocking competitors, we repeat, is not. *Compare Phillips v. Wash. Legal Found.*, 524 U.S. 156, 167 (1998) (noting the "fundamental maxim of property law that the owner of a property interest may dispose of all or part of that interest as he sees fit"), *with Ill. Transp. Trade Ass'n*, 839 F.3d at 596 ("'Property' does not include a right to be free from competition."). Nothing found in the ability to freely alienate one's own property even remotely implies the right to block others from using their own property to compete in the marketplace.

20

Moreover, the Medallion Holders overstate their right to alienate their medallions. The 1998 Ordinance expressly restricted the medallions' alienability, providing, "No new for-hire taxicab license shall be assigned, sold or transferred during the five (5) year period following the issuance of said license," and expressly reserved the power to revoke an unlawfully alienated medallion. Ordinance No. 98-105, § 31-82(q)(4). The 1998 Ordinance continued this way: "Transfer of a taxicab license may be accomplished by purchase, gift, bequest or operation of law, and is subject to the written approval of [the Department]," and "[n]o for-hire taxicab license shall be assigned, sold (either outright or under a conditional sales contract) or transferred without prior approval of [the Department]." *Id*. § 31-82(r). Indeed, one of the 1998 Ordinance's key reforms was to confine the medallions' alienation to County-registered taxicab chauffeurs. Far from suggesting a right to market dominance, the Code's alienation provisions established that the property rights created by the County were carefully calibrated.

The Medallion Holders also cite to a June 2, 2014 letter written by County Mayor Carlos A. Gimenez to Jorge Luis Lopez, Lyft's counsel and registered lobbyist, in support of their claim. The Mayor said this:

> I am writing you to underscore our conversation concerning the County's for-hire transportation ordinances. Although we may share the desire to include on-demand electronic dispatch vehicles into future options we provide our community, currently Chapter 31 of the Miami-Dade County Code . . . does not allow operation of an

21

unlicensed vehicle providing for-hire services through electronic dispatch.

The letter simply reflected the state of County law in 2014, before the County's 2016 promulgation of the TNE Ordinance. It did no more than inform Lyft's lobbyist that the County's prohibition against TNEs would be enforced. It said nothing about medallion holders, let alone establish that the Medallion Holders had the power to exclude competition. Nor could it alter or expand whatever rights the Code had conferred upon medallion holders.

Finally, as best we can tell, no case precedent supports the Medallion Holders' theory of exclusivity. What caselaw we can find overwhelmingly holds that taxicab medallion holders do not have a property right to bar competitors from entering the market. *See, e.g.*, *Ill. Transp. Trade Ass'n*, 839 F.3d at 596; *Minneapolis Taxi Owners Coal., Inc. v. Minneapolis*, 572 F.3d 502, 509 (8th Cir. 2009) ("Even if there is a property interest in a particular license, a takings claim cannot be supported by asserting ownership in a property interest that is different and more expansive than the one actually possessed.") (quotations omitted); *Joe Sanfelippo Cabs, Inc.*, 839 F.3d at 616. Indeed, in *Illinois Transportation Trade Association v. Chicago*, 839 F.3d 594 (7th Cir. 2016), the Seventh Circuit dismissed precisely the same takings claim urged upon us. It rejected the theory that, by admitting TNEs into the for-hire transportation market, the City "took" the

22

taxicabs' medallions without just compensation. *Id*. at 596–97. The court put it this

way:

> When property consists of a license to operate in a market in a particular
> way, it does not carry with it a right to be free from competition in that
> market. . . . Taxi medallions authorize the owners to own and operate taxis,
> not to exclude competing transportation services. The plaintiffs in this case
> cannot exclude competition from buses or trains or bicycles or liveries or
> chartered sightseeing vehicles or jitney buses or walking; indeed they cannot
> exclude competition from taxicab newcomers, for the City has reserved the
> right (which the plaintiffs don't challenge) to issue additional taxi
> medallions.

*Id*.[1]

The Medallion Holders' intangible property did not include the right to bar

competition and the district court properly dismissed their takings claims.

## C.

The Medallion Holders also say that the TNE Ordinance violated their right

to the equal protection of the laws under both the United States and Florida

---

[1] The Medallion Holders cite to a recent district court opinion coming out of Philadelphia.
*Checker Cab Philadelphia v. Philadelphia Parking Authority*, No. CV 16-4669, 2017 WL
2461980 (E.D. Pa. June 6, 2017). There, some medallion-holding taxicab operators alleged that
the admission of TNEs into Philadelphia's for-hire transportation market effected a "taking" of
their medallions. *Id*. at *6–7. The government moved to dismiss the claim, but the district court
denied the motion. *Id*. However, the court grounded its ruling on Pennsylvania law, which
capped the overall number of medallions. *Id*. at *7 (citing 53 Pa. Cons. Stat. § 5711(c)(2) (2017)
(limiting the total number of authorized medallions to 1,600 before June 1, 2013, and 1,750 after
June 1, 2013)). In this case, the Medallion Holders do not, and could not, allege that the TNE
Ordinance imposed a similar ceiling on the number of medallions that the County could issue.
Indeed, the TNE Ordinance expressly allowed the County to "authorize . . . additional for-hire
licenses . . . with such modifications or upon such terms and conditions as in its judgment the
public convenience and necessity may require." Ordinance No. 98-105, § 31-82(e). And the
County repeatedly exercised its authority to issue new medallions. The *Checker Cab
Philadelphia* case is factually distinguishable. It is not binding precedent. And it does not alter
our view that the states' regulatory power includes the power to alter, modify, or limit the
number of taxicab medallions issued. *See Lucas*, 505 U.S. at 1027–28.

23

Constitutions. They contend that the TNE Ordinance "created separate sets of regulations for the taxicab industry and the TNEs, resulting in unfair and arbitrary disparities between groups engaged in identical business activities, i.e. the business of providing transportation services to the public in exchange for payment." They point to discrepancies in taxicab and TNE regulations regarding chauffeur agreements, insurance requirements, vehicle inspections, and fare charges, and claim that those discrepancies systematically disadvantaged taxicabs. We remain unpersuaded.

In the absence of any allegation that the government discriminated on the basis of a suspect classification, including race, alienage, national origin, gender, or illegitimacy, we evaluate equal protection claims under rational basis review and ask only whether "the challenged statutes or ordinances [are] rationally related to the achievement of some legitimate government purpose." *Haves v. Miami*, 52 F.3d 918, 921 (11th Cir. 1995). A challenged ordinance will survive rational basis review if it could have been directed toward some legitimate government purpose, even if that purpose did not actually motivate the enacting legislature. *Id*. The ordinance will likewise overcome rational basis review if it is not so attenuated from that purpose as to be "arbitrary or irrational." *Id*. at 922. "[T]hose attacking the rationality of [a] legislative classification have the burden to negate every conceivable basis which might support it." *Id.* (quotations omitted). Not

24

surprisingly, rational basis scrutiny is "easily met." *Lieb v. Hillsborough Cty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1306 (11th Cir. 2009); *see also Williams v. Pryor*, 240 F.3d 944, 948 (11th Cir. 2001). Moreover, the Florida Constitution's equal protection clause overlaps entirely with its federal counterpart. *Sasso v. Ram Prop. Mgmt.*, 431 So. 2d 204, 211 (Fla. App. 1983) (in assessing an equal protection question, Florida courts "use federal authority as a guide because of the parallel commands of the federal and Florida constitutions"), *approved*, 452 So. 2d 932 (Fla. 1984).

The Medallion Holders neither assert that the TNE Ordinance employed a suspect classification nor dispute the applicability of rational basis review. Under that standard, their equal protection claims fail for two reasons: first, they overstate the differences in the regulatory treatment afforded taxicabs and TNEs; and, second, those regulatory distinctions that were significant were rationally related to legitimate government interests.

## 1.

The Medallion Holders say that the County regulated taxicabs more stringently than TNEs regarding insurance requirements, background checks, and vehicle inspections. The argument is refuted by the text of the Code. For starters, the Medallion Holders claim that the County subjected them to insurance requirements that were more onerous than those imposed on TNEs. In fact, the

Code prescribed virtually parallel standards for taxicabs and TNEs. It required that taxicabs carry an automobile policy with liability limits no less than those required by state law. Ordinance No. 16-43, § 31-88(a) (May 20, 2016). Florida law required a policy with limits of $125,000/250,000/50,000 that was issued by an insurer belonging to the Florida Insurance Guaranty Association. Fla. Stat. §§ 324.031–032(1)(a) (2018). Likewise, TNEs were obliged to satisfy "all of the applicable insurance provisions of State law" and to "provide supplemental insurance for each [TNE] driver and [TNE] vehicle" of "at least $125,000 per person for death or bodily injury; $250,000 per incident for death or bodily injury; and $50,000 per incident for property damage; or a combined single limit of $300,000 per incident." Ordinance No. 16-42, § 31-707(a) (May 18, 2016).

Moreover, the County prohibited TNEs from operating without "first obtain[ing] and fil[ing] with the Department a certificate of insurance demonstrating compliance with Florida insurance laws," and threatened to sanction noncompliance through license revocation. *Id*. § 31-707(b). Although TNEs could certify that their vehicles complied with insurance requirements, while taxicabs were required to furnish the Department with specific evidence of adequate insurance coverage, the Department nonetheless reserved the right to audit TNEs in order to verify compliance. *Id*. § 31-705(i). Any differences found in taxicabs' and TNEs' insurance requirements were de minimis. And it was rational for the

26

County to experiment with various manners of enforcement on different service providers.

The Medallion Holders also claim that the County subjected them to more burdensome background-check requirements than TNEs. Again, their claim is belied by the Code, which imposed essentially identical requirements on each. *Compare* Ordinance No. 16-43, § 31-82(d) (requirements for taxicabs), *with* Miami-Dade County, Fla., Ordinance No. 16-42, §§ 31-702(d), 31-703(c) (requirements for TNEs). The Code barred from taxicab license eligibility those who misrepresented material facts on their applications; were unauthorized to work in the United States; or had been convicted of, or pleaded nolo contendere to, a felony or misdemeanor involving moral turpitude relating to sex within the last five years. Ordinance No. 16-43, § 31-82(d). The Code applied the same prohibitions to TNEs. Ordinance No. 16-42, §§ 31-702(d), 31-703(c).

The Medallion Holders observe, however, that, while the Code permitted TNEs to conduct their own independent background checks, it required Medallion Holders to submit to Department inspections. Again, the Code's text largely rebuts the claim, since it allowed medallion holders "to authorize a person to operate a taxicab as a certified driver . . . after the for-hire taxicab license holder . . . has conducted a local, state and national criminal background check through a Department approved agency." Ordinance No. 16-43, § 31-93(f). There, too, the

27

County's treatment of taxicabs and TNEs was nearly identical, and cannot support an equal protection claim. Ordinance No. 16-42, § 31-702(q).

As for vehicle inspections, once again, the Code applied substantially similar rules to taxicabs and TNEs. *Compare* Ordinance No. 16-43, § 31-93(g), *with* Ordinance No. 16-42, § 31-708(f). Contrary to the Medallion Holders' claims, the Code permitted both taxicabs and TNEs to undergo independent inspections. Ordinance No. 16-43, § 31-93(g). And even though only taxicabs were required to submit proof of inspection to the Department, TNEs were obliged to "present and submit on demand a copy of the completed inspection form which shall be in [the] vehicle." Ordinance No. 16-42, § 31-708(f). There too, the County's regulation of taxicabs and TNEs was sufficiently consistent to overcome an equal protection challenge.

### 2.

To be sure, some of the County's regulations of taxicabs were more burdensome than those imposed on TNEs. Yet each was rationally related to a legitimate government interest. Thus, for example, the Code required only medallion holders, but not TNEs, to enter into a written chauffeur's agreement with each taxicab driver. However, unlike TNE licenses, medallions are limited intangible personal property. Ordinance No. 98-105, § 31-81(aa) (Aug. 17, 1998). Thus, taxicab drivers who did not own a medallion were required to lease the right

28

to operate a taxicab from a medallion holder, which required payment of lease fees and security deposits. *Id*. § 31-82(j)(13). The chauffeur-agreement requirement protected taxicab drivers from predatory practices by requiring the medallion holder to "state and itemize the compensation to be paid by the chauffeur," including "the amount of compensation that is attributable to the lease, insurance, dispatch and deposits, if any." *Id*. § 31-82(j)(13)(d). The requirement also prohibited the medallion holder from "receiv[ing] any compensation from the chauffeur which [was] not specified in the existing chauffeur's agreement." *Id*.

In contrast, since TNE drivers generally used their own vehicles, they did not have to enter into leases or pay security deposits and other fees in order to operate in the market. Furthermore, the series of memorialized receipts generated through TNEs' digital platforms rendered the drivers' compensation more transparent. Ordinance No. 16-42, § 31-702(l)(17). The business relationship between TNEs and their drivers differed substantially from the one between medallion holders and taxicab chauffeurs; mandatory chauffeur agreements were not necessary to protect TNE drivers against predation. The County's imposition of the chauffeur-agreement requirement on taxicabs, but not on TNEs, was rationally related to a legitimate governmental interest.

The Medallion Holders also point to disparities found in the County's vehicle appearance regulations. The 2016 Ordinance required taxicabs to "be free

29

of grime, oil or other substances and free from cracks, breaks, dents and damaged paint that detracts from the overall appearance of the vehicle"; that the vehicles be "[e]quipped with hubcaps or wheelcovers on all four (4) wheels"; that "[t]he interior of the trunk, or rear portion of for-hire vehicles, . . . be free from dirt, grime, oil, trash, or other material which could soil items placed therein"; and that "the passenger compartment . . . be clean, free from torn upholstery or floor coverings, damaged or broken seats, and protruding sharp edges." Ordinance 16-43, § 31-89(a)(9), (11)–(12). On the other hand, the TNE Ordinance required only that all TNE vehicles "be kept clean and orderly during all times of active service." Ordinance No. 16-42, § 31-708(a).

The different treatment of taxicabs and TNEs was supported by a rational foundation. Directing the use of property toward certain aesthetic ends -- especially property that is uniquely reflective of the surrounding polity -- is a legitimate government interest. *Cf. Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 131 (1978). Taxicabs are typically associated with the County. Consequently, the County required taxicab companies to maintain scrupulously clean vehicles in order to reflect a positive image for the County. By contrast, because TNE vehicles are primarily personal, the County was understandably less concerned with their appearance. Moreover, by their nature, taxicabs are always associated with the transportation of individuals for hire and, therefore, must maintain a clean

30

appearance at all times. In contrast, the TNE vehicles are primarily personal vehicles used only some of the time in the for-hire transportation business.

Finally, although the County regulated taxicab fares more stringently than TNE rates, that disparity was also rational. While the County established price ceilings for taxicab fares, it enabled TNEs to set their own rates "based on distance traveled and/or time elapsed during service, a flat prearranged rate or a suggested donation." *Compare* Ordinance No. 16-43, § 31-87(C)(5), *with* Ordinance No. 16-42, § 31-706. Taxicabs' and TNEs' distinct business models justified that regulatory divergence. Taxicabs operate primarily through street hails. Since passengers usually cannot confirm ride prices before hailing a cab, price ceilings were rationally related to protecting passengers from predatory fares. On the other hand, TNEs provide customers with cost and driver data before any contract is struck, and enable customers to shop among providers before summoning a ride. Since market forces disciplined TNE rates more effectively than taxicab fares, the County rationally intervened to establish taxicab price ceilings. Furthermore, those price ceilings did not competitively disadvantage medallion holders, since they did not bar them from undercutting TNE prices. "There are enough differences between taxi service and [TNE] service to justify different regulatory schemes, and the existence of such justification dissolve[s] the plaintiffs' equal protection claim[s]." *Ill. Transp. Trade Ass'n*, 839 F.3d at 598–99.

31

The long and short of it is that the Medallion Holders' constitutional claims fail. Their takings claims falter because they cannot lay claim to a property interest that includes the power to block competitors from the for-hire transportation market. And their equal protection claims fail because any disparate regulatory treatment that the County afforded taxicabs and TNEs was amply supported by legitimate government interests. The judgment of the district court is affirmed.[2]

**AFFIRMED IN PART AND VACATED AND REMANDED IN PART**

---

[2] The Medallion Holders also claim that the district court erred in denying them leave to amend their complaint on the ground that amendment would be futile. Amendment would be futile if the complaint, as amended, would still be subject to dismissal. *Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007). Requests for leave to amend "should either set forth the substance of the proposed amendment or attach a copy of the proposed amendment." *Long v. Satz*, 181 F.3d 1275, 1279 (11th Cir. 1999). The Medallion Holders seek leave to amend based only on the arguments already aired in their briefs. Permitting leave to amend to reprise the same arguments could only be futile. The district court properly denied leave.

32