[DO NOT PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 24-11442

_____

CHIDI AHANOTU,

Plaintiff-Appellant,

*versus*

THE RETIREMENT BOARD OF BERT BELL/PETE ROZELLE
NFL PLAYER RETIREMENT PLAN,
THE BERT BELL/PETE ROZELLE NFL PLAYER
RETIREMENT PLAN,

Defendants-Appellees.

———————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:23-cv-80745-DMM

———————————————

Before JORDAN, NEWSOM, Circuit Judges, and CORRIGAN,[*] District Judge.

PER CURIAM:

After playing 12 seasons in the National Football League, Chidi Ahanotu applied for two types of disability benefits from the Bert Bell/Pete Rozelle NFL Player Retirement Plan. In a letter, the Plan awarded him only the less generous benefit, without mentioning the other. Ahanotu alleges that one of the Plan's employees tampered with his application and that the Plan fraudulently concealed that fact from him to deny him the more lucrative benefits. He sued the Bert Bell/Pete Rozelle NFL Retirement Plan and Retirement Board for retroactive benefits under 29 U.S.C. § 1132(a)(1)(B). The district court dismissed Ahanotu's suit because it concluded that he hadn't exhausted his administrative remedies.

After carefully considering the issues, and with the benefit of oral argument, we affirm the district court's judgment. Although

---

[*] The Honorable Timothy J. Corrigan, United States District Judge for the Middle District of Florida, sitting by designation.

we assume without deciding that Ahanotu properly exhausted his administrative remedies, we conclude that the district court was right to dismiss his complaint in any event—not only because his suit was barred by the Plan's 42-month contractual limitations period but also because he failed to plead a plausible claim to relief.

# I

## A

Chidi Ahanotu is a former NFL player who retired from the League in 2005 after 12 seasons. In 2006, he applied for disability benefits from the Bert Bell/Pete Rozelle NFL Player Retirement Plan—an ERISA-governed pension- and welfare-benefit plan that the NFL Management Council and NFL Players Association established through collective bargaining.

The Plan provides two types of disability benefits: Line-of-Duty and Total and Permanent Disability. Line-of-Duty benefits are less generous and are meant for players who incur a "substantial disablement" "arising out of League football activities." Retirement Plan at 32–33, Dkt. No. 53-1. They are paid out monthly, for no more than 90 months, in an amount determined by multiplying a Player's "Credited Seasons" by the dollar amount assigned to that Credited Season, but not less than a minimum of $1,000 per month.

Total and Permanent Disability benefits are more generous and difficult to get. They are available to players who are "totally and permanently disabled"—*i.e.*, "substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit." *Id.* at 28. There are four levels of

"T&P" benefits—the highest of which (so to speak) is called "Active Football."  To qualify for this most lucrative type, the player must have a disability that "results from League football activities, arises while the Player is an Active Player, and causes the Player to be totally and permanently disabled 'shortly after' the disabilit[y] first arises." *Id.* at 26.  The Plan further specifies that "a Player who becomes totally and permanently disabled more than 12 months after a disabilit[y] first arises will be conclusively deemed not to have become totally and permanently disabled 'shortly after' the disabilit[y] first arises." *Id.* at 27.

When a player applies for benefits, that triggers the Plan's two-stage administrative-review process.  First, the Plan's Disability Initial Claims Committee decides all initial claims.  Then, if a player's claim is denied in whole or in part, he can, within "180 days from the receipt of an adverse benefit determination," "file a written request for review of the initial decision to the Retirement Board"—the Plan's named fiduciary. *Id.* at 47.  The Plan also dictates that "[n]o suit or legal action with respect to an adverse benefit determination may be commenced more than 42 months from the date of the final decision on the claim for benefits (including the decision on review)." *Id.* at 50.

We now turn to Ahanotu's 2006 application—the first page of which had the following markings:



Application at 2, Dkt. No. 53-2.  Ahanotu's application also included a filled-out section covering Line-of-Duty benefits, the signature page, and an attachment titled "Line of Duty Disabilities." It did not include the section for T&P benefits or any list of "T&P Disabilities."

After reviewing Ahanotu's application, the Initial Claims Committee awarded him Line-of-Duty benefits.  In the letter informing Ahanotu of that decision, the Committee did not mention T&P benefits, nor did it state that Ahanotu had 180 days to request the Board's review of any adverse benefit determination.  Ahanotu did not request review of the Committee's determination or otherwise follow up regarding the application.

Fifteen years later, in 2021, Ahanotu requested and received from the Plan a copy of his 2006 application.[1]  Upon receiving it, he emailed the Plan and alleged that "[s]omeone tampered with

---

[1] Ahanotu asserts that he "did not retain a copy of [his] 2006 application" around the time he submitted it.  Second Am. Compl. ¶ 35, Dkt. No. 53.  He does not allege that he asked for a copy of his 2006 application any time before 2021, or that the Plan ever withheld the application from him.

[his] disability application"—specifically, that "[s]omeone [c]rossed out 'both LOD and T&P' and checked LOD only." Email at 2, Dkt. No. 61-8. Ahanotu demanded that the Plan make up for this purported malfeasance by paying him "T&P funds retroactively to 2005 when [he] applied for disability initially." *Id.* The Plan responded that the 2006 decision was final and "not subject to further administrative review." Second Am. Compl. ¶ 46, Dkt. No. 53.

## B

Ahanotu sued the Retirement Plan and Board under 29 U.S.C. § 1132(a)(1)(B), an ERISA provision that authorizes a benefit-plan participant or beneficiary "to recover benefits due to him under the terms of his plan." In his second amended complaint,[2] he alleged that the defendants engaged in "fraudulent concealment" by tampering with his 2006 application, granting him only Line-of-Duty benefits, and declining to inform him about their decision regarding T&P benefits or the 180-day timeline to seek review. *See* Second Am. Compl. ¶¶ 55–102. As recompense, Ahanotu demanded, among other things, "[p]ast T & P disability benefits under the 'Active Football' category benefits from 2006,"

---

[2] The district court dismissed Ahanotu's first amended complaint for reasons that largely mirror its ultimate dismissal of the second amended complaint. The first dismissal was without prejudice: The district court decided to "grant [Ahanotu] one final opportunity to amend his complaint," even though it was "not convinced that [its] defects c[ould] be cured." First Order Granting Mot. to Dismiss at 7, Dkt. No. 44.

as well as "[f]uture T & P disability benefits as if he was classified under the 'Active Football' category since 2006." *Id.* ¶ 102.

Upon the defendants' motion, the district court dismissed Ahanotu's second amended complaint. It determined that Ahanotu had failed to exhaust his administrative remedies given his "explicit[] admi[ssion] . . . that he did not appeal the 2006 decision" as required by the Plan's two-stage process. Second Order Granting Mot. to Dismiss at 5, Dkt. No. 69. The district court also held that Ahanotu had not adequately established any proper grounds for excusing his failure to exhaust.

This is Ahanotu's appeal.[3]

## II

The district court dismissed Ahanotu's suit based on its conclusion that he had not exhausted his administrative remedies. On this appeal, we assume—without deciding—that Ahanotu *did* exhaust his administrative remedies. Nonetheless, we affirm the district court's dismissal on two alternate grounds: (1) because Ahanotu's suit was barred by the Plan's 42-month contractual

---

[3] We review de novo the district court's decision to dismiss the complaint, "accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Checker Cab Operators, Inc. v. Miami-Dade Cnty.*, 899 F.3d 908, 915 (11th Cir. 2018) (citation modified). "To withstand a motion to dismiss under Rule 12(b)(6), a complaint must include enough facts to state a claim to relief that is plausible on its face"—*i.e.*, the plaintiff must plead enough "factual content [to] allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation modified).

limitations period; and (2) because Ahanotu failed to state a plausible claim to relief.  *See Waldman v. Conway*, 871 F.3d 1283, 1289 (11th Cir. 2017) ("We may affirm on any ground supported by the record, regardless of whether that ground was relied upon or even considered below.").  We discuss each of these grounds in turn.

### A

The Plan states that "[n]o suit or legal action with respect to an adverse benefit determination may be commenced more than 42 months from the date of the final decision on the claim for benefits (including the decision on review)."[4]  Retirement Plan at 50.  Ahanotu submitted his application on February 4, 2006, and the defendants sent him the letter awarding only Line-of-Duty benefits two months later, on April 13, 2006.  Ahanotu sued more than 17 years later—in May 2023.

Ahanotu's suit is untimely by a considerable margin—even if we accept his contention that the defendants' letter "failed to notify [him of] . . . any adverse benefit determination" regarding the T&P benefits.  Br. of Appellant at 8.  Our decision in *Witt v. Metropolitan Life Insurance Co.*, 772 F.3d 1269 (11th Cir. 2014), is instructive.  That appeal involved a dispute over when the limitations period for the plaintiff's ERISA claim began to run.  The plaintiff maintained that "the limitations period did not begin to run until May 4, 2012, when MetLife issued a final, conclusive, and written

---

[4] When he applied, Ahanotu had access to a full copy of the Retirement Plan, which he also attached to his complaint.

decision denying him benefits." *Id.* at 1275. Witt alleged that "he never received MetLife's 1997 letter terminating his benefits and, therefore, the statute of limitations did not begin running back in 1997." *Id.* MetLife, meanwhile, "contend[ed] that the limitations period began to run when MetLife stopped making monthly payments to Witt because, at that point, Witt knew or should have known that his claim had been denied." *Id.*

We ruled in MetLife's favor. Looking to caselaw from three sister circuits, we observed that those courts had "squarely concluded that an ERISA cause of action accrues—and the limitations period begins to run—when the claimant has reason to know that the claim administrator has clearly repudiated the claim or amount sought." *Id.* at 1276–77 (collecting cases). Applying that rule, we concluded that "[e]ven assuming that Witt did not receive MetLife's termination letter sent on May 22, 1997, MetLife's conduct nonetheless demonstrated a clear and continuing repudiation of Witt's rights by failing to provide him any monthly benefits after April 30, 1997." *Id.* at 1278. "Even if we were to require an entire year of denied payments before holding MetLife's nonpayment to constitute a 'clear and continuing' repudiation of Witt's rights, Witt would undoubtedly have had reason to know of the repudiation at least by May 1, 1998, and the six-year statute of limitations expired by May 1, 2004, at the latest." *Id.* There thus was no need to "decide the exact number of missing monthly benefits payments that were required to put Witt on notice that his claim had been clearly repudiated and thus denied." *Id.* We did, however, firmly

"reject Witt's attempt to inexorably tie the start of the limitations period to a formal denial letter." *Id.*

*Witt*'s logic is fatal to Ahanotu's case. He received the defendants' letter in April 2006, but filed his complaint in May 2023. He contends that the defendants' 2006 letter wasn't a final adverse determination because it didn't clearly deny his claim for T&P benefits. Even if that's right, it doesn't help him. For Ahanotu's complaint to have been timely, the decision must not have become final until November 2019—*i.e.*, 42 months before he filed his complaint. Ahanotu's position, therefore, must be that for 13 years he had no idea that the defendants denied his claim for T&P benefits. Under *Witt*, that's too tall an order. At some point in those 13 years, the defendants' refusal to pay him his requested benefits—even without a formal denial letter—constituted "a clear and continuing repudiation of [Ahanotu's] rights." *See Witt*, 772 F.3d at 1278. That's especially true because, by then, Ahanotu had reapplied several times for T&P benefits. Because Ahanotu's suit thus was untimely, the district court was right to dismiss it.

**B**

Even if we disregarded both exhaustion and untimeliness, Federal Rule of Civil Procedure 8 would still compel dismissal. Rule 8 requires the plaintiff to provide "a short and plain statement of the claim showing that [he] is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although "the pleading standard Rule 8 announces does not require 'detailed factual allegations,'" it does "demand[] more than an unadorned, the-defendant-unlawfully-harmed-me

accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation modified). "To survive a motion to dismiss," the *Iqbal* Court held, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (citation modified). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citation modified).

Even when viewed through a plaintiff-friendly lens, *see Checker Cab Operators*, 899 F.3d at 915, Ahanotu's second amended complaint does not state a plausible claim to relief. Indeed, his allegations fall short in two respects. *First*, the complaint does not plausibly show that Ahanotu was entitled to the T&P benefits that he now seeks retroactively. Ahanotu baldly asserts that he "is entitled to the full amount of T&P disability benefits under the 'Active Football' category provided under the Plan calculated from the 2006 application and in the future." Second Am. Compl. ¶ 71. The only factual support he marshals is the copy of his 2006 application that he obtained in 2021. But that attachment contains no description of injuries that would qualify for those benefits; all it does, in fact, is list his "Line of Duty Disabilities." *See* Application at 4. This is not enough "factual matter, accepted as true, to state a claim" for retroactive T&P benefits in the most generous "Active Football" category. *See Iqbal*, 556 U.S. at 678.

*Second*, Ahanotu's allegations do not plausibly sustain the theory of fraudulent concealment upon which his ERISA claim is

premised.    At best, Ahanotu offers two "factual" assertions: (1) "[w]ithout Chidi O. Ahanotu's consent, his selection in the application of both LOD and T&P benefits was crossed out, and an unknown person at [the Plan's] office selected only LOD benefits," Second Am. Compl. ¶ 23; and (2) when Ahanotu received a copy of his application in 2021, "pages were missing," "meaning someone at the benefit office had to . . . discard the pages," *id.* ¶¶ 38–40. These two allegations, standing alone, do not satisfy Rule 8's plausibility requirement—*i.e.*, they don't provide enough "factual content [to] allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.    Ahanotu offers nothing but speculation about what an unknown person working for the defendants must have done.    He also fails to explain why he did not reach out about the 2006 application for 15 years—a period during which he submitted several more benefits applications.    Thus, even if we assume that someone *did* alter the application, that fact alone still would not plausibly suggest that the defendants committed a fraud to deprive him of the benefits to which he hasn't shown he was entitled.[5]

---

[5] For similar reasons, Ahanotu has not established that he is entitled to equitable estoppel or equitable tolling. *See Ferry v. Hayden*, 954 F.2d 658, 661–62 (11th Cir. 1992) ("In order for a court to apply equitable estoppel, the party claiming the estoppel must have relied on its adversary's conduct in such a manner as to change his position for the worse, and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." (citation modified)); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (stating that "equitable doctrines such as tolling or estoppel" should "be applied sparingly").

### III

Even assuming that Ahanotu exhausted his administrative remedies, his claim is still barred by the Plan's contractual limitations period, and he did not state a plausible claim to relief, in any event.  We therefore **AFFIRM** the district court's dismissal of his second amended complaint.