# Illinois Official Reports

## Appellate Court

---

### *Doe v. Lyft, Inc.*, 2020 IL App (1st) 191328

---

| | |
|---|---|
| Appellate Court Caption | JANE DOE, Plaintiff-Appellant, v. LYFT, INC.; ANGELO McCOY; and STERLING INFOSYSTEMS, INC., d/b/a Sterling Talent Solutions, Defendants (Lyft, Inc., Defendant-Appellee). |
| District & No. | First District, Fourth Division<br>No. 1-19-1328 |
| Filed | September 30, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 17-L-11355; the Hon. Patricia O'Brien Sheahan, Judge, presiding. |
| Judgment | Affirmed and remanded; certified questions answered. |
| Counsel on Appeal | J. Timothy Eaton, Jonathan B. Amarilio, Allison E. Czerniak, and Ioana M. Guset, of Taft Stettinius & Hollister LLP, and Timothy S. Tomasik, Patrick J. Giese, and Patrick M. Grim, of Tomasik Kotin Kasserman, LLC, both of Chicago, for appellant.<br><br>Anthony J. Carballo and Martin Syvertsen, of Freeborn & Peters, LLP, of Chicago, and Beth A. Stewart (*pro hac vice*), of Williams & Connolly LLP, Washington, D.C., for appellee. |

Leslie J. Rosen, of Leslie J. Rosen Attorney at Law, PC, of Chicago, for *amicus curiae* Illinois Trial Lawyers Association.

Joshua D. Yount, of Mayer Brown LLP, of Chicago, for *amicus curiae* Chamber of Commerce of the United States of America.

Panel      JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Justice Burke concurred in the judgment and opinion.
Presiding Justice Gordon concurred in part and dissented in part, with opinion.

# OPINION

¶ 1   This appeal presents two questions certified by the trial court under Illinois Supreme Court Rule 308 (eff. July 1, 2017) regarding the scope and constitutionality of section 25(e) of the Transportation Network Providers Act (or Act) (625 ILCS 57/25(e) (West 2018)), which declares that ridesharing companies like Uber and Lyft (called transportation network companies or TNCs under the statute) "are not common carriers, *** as defined by applicable State law." Under the common law, a common carrier owes its passengers the highest duty of care and is subject to vicarious liability if its agent commits an intentional tort against a passenger, even if the agent's conduct falls outside the scope of the agency relationship. The questions we address here are (1) whether section 25(e) exempts ridesharing companies from the heightened duty of care and standard of vicarious liability that apply to common carriers and (2) if so, whether section 25(e) violates the Illinois Constitution's ban on special legislation (Ill. Const. 1970, art. IV, § 13) or whether the Act itself was passed in violation of the Illinois Constitution's three-readings rule (Ill. Const. 1970, art. IV, § 8(d)). For the following reasons, we answer the first question in the affirmative and the second question in the negative.

¶ 2            I. BACKGROUND

¶ 3   Lyft, Inc. (Lyft), is a ridesharing company that provides an alternative to traditional taxicab service. It operates an on-demand transportation network that uses a smartphone application (or "app") to connect individuals in search of rides with drivers willing to provide them using their personal vehicles. In July 2017, after an evening out with friends, plaintiff Jane Doe used the Lyft app on her smartphone to hail a ride home.[1] The app matched Doe with Angelo McCoy, a driver in the Lyft network. A short time later, McCoy arrived at Doe's location, and Doe got in the back seat of McCoy's vehicle. At some point during the ride, Doe fell asleep. McCoy then drove to a secluded alley, where he brandished a knife, zip-tied Doe's hands, and repeatedly sexually assaulted her. After the attack, McCoy drove away with Doe still in the

---

[1]Because Doe's claims were dismissed on the pleadings, we accept all well-pleaded allegations in her complaint as true for purposes of this appeal. *Doe v. Coe*, 2019 IL 123521, ¶ 20.

back seat of his vehicle. Doe eventually escaped when McCoy stopped briefly for a traffic light.

¶ 4        Doe sued McCoy, Lyft, and Sterling Infosystems, Inc. (Sterling), the company Lyft uses to conduct background checks of its drivers. Doe's complaint included claims of assault and battery and false imprisonment against McCoy and a claim of negligence against Sterling. As to Lyft, Doe alleged that it was directly liable for negligently hiring, retaining, and supervising McCoy and for fraudulently representing itself as a safe transportation option. (Those claims are not at issue in this appeal.) Doe also alleged that, as McCoy's principal or employer, Lyft was vicariously liable for his intentional torts against her.

¶ 5        Lyft moved to dismiss the vicarious liability claims as legally insufficient under section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2018)). It acknowledged that a principal or employer may be held vicariously liable for its agent's or employee's conduct if the conduct fell within the scope of the agency or employment relationship.[2] See *Wilson v. Edward Hospital*, 2012 IL 112898, ¶ 18. But Lyft argued that it cannot be held vicariously liable for McCoy's attack on Doe because acts of sexual assault, as a matter of law, fall outside the scope of an agency or employment relationship. See *Doe v. Lawrence Hall Youth Services*, 2012 IL App (1st) 103758, ¶ 30.

¶ 6        In response, Doe argued that Lyft can be held vicariously liable for its agent's or employee's intentional tort against a passenger, even if the relevant conduct fell outside the scope of the agency or employment relationship, because Lyft is a common carrier that owes its passengers a heightened and nondelegable duty of care. See *Dennis v. Pace Suburban Bus Service*, 2014 IL App (1st) 132397, ¶¶ 13-16. Doe argued that, like a traditional taxicab company, Lyft is a common carrier because it provides transportation services to the general public. See *Browne v. SCR Medical Transportation Services, Inc.*, 356 Ill. App. 3d 642, 646 (2005) ("A common carrier is one who undertakes for hire to carry all persons indifferently who may apply for passage so long as there is room and there is no legal excuse for refusal." (Internal quotation marks omitted.)); *Anderson v. Yellow Cab Co.*, 28 Ill. App. 3d 656, 657 (1975) ("A taxicab is a common carrier.").

¶ 7        Even if Lyft is not a common carrier, Doe argued, it should nonetheless be held to the same standard of care as a common carrier. Doe noted that the heightened duty of care and principles of vicarious liability applicable to common carriers have been extended to non-common carrier school bus operators on the ground that they perform the same basic function and exercise the same control over their passengers' safety as common carriers. See *Green v. Carlinville Community Unit School District No. 1*, 381 Ill. App. 3d 207, 214 (2008); *Doe v. Sanchez*, 2016 IL App (2d) 150554, ¶¶ 27-35. The same considerations, Doe argued, support the extension of common carrier liability to ridesharing companies, such as Lyft, even if they are not otherwise deemed common carriers.

¶ 8        In reply, Lyft invoked section 25(e) of the Transportation Network Providers Act, which declares that transportation network companies (or TNCs) and their drivers "are not common carriers, contract carriers or motor carriers, as defined by applicable State law, nor do they provide taxicab or for-hire vehicle service." 625 ILCS 57/25(e) (West 2018). (Doe does not

---

[2]In its motion to dismiss, Lyft assumed that McCoy was its agent or employee but reserved the right to contest the issue later. For purposes of this appeal, we likewise assume that McCoy was an agent or employee of Lyft.

dispute that Lyft is a TNC, which is defined as "an entity *** that uses a digital network or software application service to connect passengers to transportation network company services provided by transportation network company drivers." *Id.* § 5.) In light of section 25(e), Lyft argued, it is not a common carrier as a matter of law and thus not subject to the standards of liability applicable to common carriers, including vicarious liability for the torts of its agents, such as sexual assault, that fall outside the scope of the agency relationship.

¶ 9    Lyft argued that section 25(e) would be rendered meaningless if ridesharing companies could be treated as though they were common carriers for liability purposes despite that section's declaration that they are not common carriers. Regardless, Lyft argued, the decisions in *Green* and *Sanchez* extending common carrier standards of liability to non-common carrier school bus operators rest on the unique safety concerns presented by the transportation of school children and do not support the extension of common carrier liability to other non-common carriers.

¶ 10    In a surreply, Doe argued that section 25(e) is unconstitutional for two reasons. First, she argued that section 25(e) violates the Illinois Constitution's ban on special legislation because it arbitrarily treats ridesharing companies more favorably than similarly situated entities such as taxicab companies. Second, Doe argued that in passing the Transportation Network Providers Act, including section 25(e), the General Assembly did not adhere to the Illinois Constitution's three-readings rule, which mandates that "[a] bill shall be read by title on three different days in each house" before passage. Ill. Const. 1970, art. IV, § 8(d).

¶ 11    After hearing oral argument, the circuit court issued a written opinion dismissing Doe's vicarious liability claims without prejudice. The court recognized that a common carrier may be held vicariously liable for an intentional tort committed by its agent against a passenger even if the agent's conduct fell outside the scope of the agency relationship. And the court noted that, absent section 25(e), ridesharing companies would likely be deemed common carriers. But the court concluded that section 25(e) plainly exempts ridesharing companies from common carrier status, meaning that Lyft may not be deemed a common carrier as a matter of law. And treating Lyft as though it were a common carrier, the court explained, would undermine the legislative intent of section 25(e).

¶ 12    The circuit court next addressed Doe's constitutional challenges. In rejecting her special legislation challenge, the court held that section 25(e) does not arbitrarily discriminate between ridesharing companies and their competitors. Although the court recognized that one purpose of the Transportation Network Providers Act is to ensure the safety of ridesharing passengers, the court found that section 25(e)'s exemption of ridesharing companies from common carrier status is rationally related to the Act's additional goal of "promot[ing] and enabl[ing] the growth of TNCs in the state of Illinois." Quoting *Illinois Transportation Trade Ass'n v. City of Chicago*, 839 F.3d 594, 599 (7th Cir. 2016), the court explained that it is "permissible for a government to choose 'the side of deregulation, and thus of competition,' when it decides how to regulate various entities and activities." The court also rejected Doe's challenge under the three-readings rule, finding that the manner in which the Act was passed was "uncommon" but not "disallowed."

¶ 13    In light of its determination that section 25(e) is a valid exercise of legislative authority, the court held that Doe was barred from recovering against Lyft under a common carrier theory of vicarious liability. However, while the court had earlier stated that it would be inconsistent with the intent of section 25(e) to treat ridesharing companies as though they were common

carriers, the court left open the possibility that a different theory of vicarious liability premised on the extension of common carrier standards of liability to non-common carriers, as in *Green* and *Sanchez*, may be valid. The court accordingly dismissed Doe's vicarious liability claims without prejudice.

¶ 14      The court then certified two questions of law for immediate appeal under Rule 308:[3] (1) whether section 25(e) of the Transportation Network Providers Act "preclude[s] TNCs, such as Lyft, from otherwise being subject to the highest duty of care under common law, like that of a common carrier's elevated duty to its passengers," and (2) if so, whether the Act is constitutional. We allowed Doe's timely application for leave to appeal.

¶ 15      <center>II. ANALYSIS</center>

¶ 16      Because an appeal under Rule 308 is limited to questions of law, our standard of review is necessarily *de novo*. *Rozsavolgyi v. City of Aurora*, 2017 IL 121048, ¶ 21. In particular, we review questions involving the scope and interpretation of a statute and its constitutionality *de novo*. See *Raab v. Frank*, 2019 IL 124641, ¶ 18 (questions of statutory construction); *People v. Swenson*, 2020 IL 124688, ¶ 19 (constitutional questions). We also review a circuit court's order granting a section 2-615 motion to dismiss *de novo*. *Doe v. Coe*, 2019 IL 123521, ¶ 20.

¶ 17      <center>A. Section 25(e) Exempts TNCs From Common Carrier<br>Standards of Liability</center>

¶ 18      Section 25(e) of the Transportation Network Providers Act declares that TNCs "are not common carriers, contract carriers or motor carriers, as defined by applicable State law, nor do they provide taxicab or for-hire vehicle service." 625 ILCS 57/25(e) (West 2018). The first certified question asks whether this provision precludes TNCs from being subject to the same heightened duty of care and principles of vicarious liability applicable to common carriers. We hold that it does.[4]

¶ 19      Under the doctrine of *respondeat superior*, a principal or employer is generally subject to vicarious liability for the tortious conduct of its agent or employee only if the conduct "fell within the scope of the agency or employment." *Wilson*, 2012 IL 112898, ¶ 18. An agent or

---

[3] Rule 308 provides: "When the trial court, in making an interlocutory order not otherwise appealable, finds that the order involves a question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, the court shall so state in writing, identifying the question of law involved. *** The Appellate Court may thereupon in its discretion allow an appeal from the order." Ill. S. Ct. R. 308(a) (eff. July 1, 2017).

[4] The Transportation Network Providers Act was repealed by its own terms on June 1, 2020. See 625 ILCS 57/34 (West 2018). The General Assembly purported to revive the Act on June 12, 2020, by amending the repeal date to June 1, 2021. See Pub. Act 101-639, § 40 (eff. June 12, 2020) (amending 625 ILCS 57/34). It is unclear whether this action was effective in reviving the statute. See 5 ILCS 70/3 (West 2018) ("No act or part of an act repealed by the General Assembly shall be deemed to be revived by the repeal of the repealing act."). But we need not resolve that issue here. Even if the Act is no longer in effect, its repeal does not retroactively alter the parties' rights or render this appeal moot. See *Perry v. Department of Financial & Professional Regulation*, 2018 IL 122349, ¶ 43 ("if a statutory change is substantive, then the change is not to be applied retroactively").

employee's conduct "is not within the scope of [the agency or] employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the [principal or employer]." (Internal quotation marks omitted.) *Pyne v. Witmer*, 129 Ill. 2d 351, 360 (1989). Applying this standard, we have held that an act of sexual assault, "by its very nature, precludes the conclusion that it was committed within the scope of employment." *Lawrence Hall Youth Services*, 2012 IL App (1st) 103758, ¶ 28; see also *Stern v. Ritz Carlton Chicago*, 299 Ill. App. 3d 674, 677-81 (1998); *Deloney v. Board of Education of Thornton Township*, 281 Ill. App. 3d 775, 784-88 (1996). Doe does not dispute (at least for purposes of this appeal) that McCoy's alleged conduct fell outside the scope of his agency or employment with Lyft.

¶ 20 As Doe notes, however, the presence of one of several special relationships—that of common carrier and passenger, innkeeper and guest, custodian and ward, and business invitor and invitee—gives rise to a heightened duty of care that includes an affirmative duty to aid or protect against an unreasonable risk of physical harm from third parties, including one's agents or employees. See *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 20; *Gress v. Lakhani Hospitality, Inc.*, 2018 IL App (1st) 170380, ¶ 15. As relevant here, "the high duty of care a common carrier owes its passengers is premised on the carrier's unique control over its passengers' safety." *Sanchez*, 2016 IL App (2d) 150554, ¶ 39. Because this heightened duty of care is nondelegable, a common carrier may be held vicariously liable for its agent's intentional tort against a passenger even if the agent's conduct, such as sexual assault, falls outside the scope of the agency or employment relationship. *Id.* ¶ 52; *Dennis*, 2014 IL App (1st) 132397, ¶¶ 13-16; *Green*, 381 Ill. App. 3d at 212-13.

¶ 21 We may assume (without deciding) that, in the absence of section 25(e), Lyft and other TNCs, like traditional taxicabs, would be deemed common carriers. See *Anderson*, 28 Ill. App. 3d at 657 (recognizing taxicab as common carrier). "A common carrier is one who undertakes for hire to carry all persons indifferently who may apply for passage so long as there is room and there is no legal excuse for refusal." (Internal quotation marks omitted.) *Browne*, 356 Ill. App. 3d at 646. "The definitive test to be employed to determine if a carrier is a common carrier is whether the carrier serves all of the public alike." *Doe v. Rockdale School District No. 84*, 287 Ill. App. 3d 791, 794 (1997). Doe's complaint alleges that Lyft markets itself as a transportation company providing rides to the general public, that it offers its services to the general public through a freely available smartphone app, and that it charges its passengers standardized fares. Doe further alleges that Lyft prohibits its drivers from refusing to provide service based on race, national origin, religion, sexual orientation, gender or gender identity, physical or mental disability, medical condition, marital status, or age.[5] Accepting these well-pleaded allegations as true, we cannot say that Lyft and other TNCs would not be deemed common carriers under the traditional definition of that term.

¶ 22 The problem for Doe, of course, is that section 25(e) declares that TNCs are *not* common carriers. Doe does not contest that Lyft is a TNC, and it clearly is. See 625 ILCS 57/5 (West 2018) (defining a TNC as "an entity *** that uses a digital network or software application

---

[5]Indeed, the Transportation Network Providers Act requires all TNCs to "adopt and notify [their] drivers of a policy of non-discrimination on the basis of destination, race, color, national origin, religious belief or affiliation, sex, disability, age, sexual orientation, or gender identity with respect to passengers and potential passengers." 625 ILCS 57/20(a) (West 2018).

service to connect passengers to transportation network company services provided by transportation network company drivers"). Doe argues, however, that Lyft should be held to the same heightened and nondelegable duty of care to its passengers that would apply if it were a common carrier, section 25(e) notwithstanding. Doe's argument rests primarily on the decisions in *Green* and *Sanchez*, which extended principles of common carrier liability, including vicarious liability for a driver's sexual assault of a passenger, to non-common carrier school bus operators. Doe reads those decisions as standing for the proposition that any provider of transportation services that exercises a high degree of control over its passengers' safety must be held to the same duty of care that applies to common carriers. We do not read either decision so broadly.

¶ 23 *Green* held that, although a school district that operates buses to transport its students is not a common carrier, it owes the students it transports the same duty of care that a common carrier owes its passengers. 381 Ill. App. 3d at 213. The court reasoned that, when busing students, a school district "is performing the same basic function [as a common carrier], transporting individuals." *Id.* And "[l]ike a passenger on a common carrier," the court explained, "a student on a school bus cannot ensure his or her own personal safety but must rely on the school district to provide fit employees to do so." *Id.*

¶ 24 *Sanchez* similarly held that a private school bus operator "owes the students it transports the same duty of care imposed on a common carrier." 2016 IL App (2d) 150554, ¶ 27. There, the court noted that "the high duty of care a common carrier owes its passengers is premised on the carrier's unique control over its passengers' safety." *Id.* ¶ 39. It is thus appropriate to hold a private school bus operator to a common carrier's duty of care, the court explained, because "a school bus driver is in unique control over the safety of students because he or she is often the only adult present during the commute." *Id.*

¶ 25 Doe contends that it is equally appropriate to hold Lyft and other TNCs to a common carrier's duty of care because TNCs also perform the same basic function as a common carrier and exercise significant control over the safety of their passengers. But we cannot ignore the context in which *Green* and *Sanchez* arose, namely, the transportation of school children. In *Green*, the court emphasized that its holding was "limited to the common-law duty school districts owe student passengers while the students are being transported on a school bus." 381 Ill. App. 3d at 214. The court stressed that because "children on a school bus" are "the most vulnerable members of our society," it would be "ludicrous" to afford them less protection than "adults on public transportation buses." *Id.* at 213. Indeed, *Sanchez* recognized that "*Green*'s core rationale [was] that school children require the highest standard of care in their transport." *Sanchez*, 2016 IL App (2d) 150554, ¶ 30. And *Sanchez* itself relied on the same rationale, invoking "the strong public policy to ensure the safe transportation of students" (*id.* ¶ 27) and "the importance [that] Illinois rightly places on the safety of school children" (*id.* ¶ 39). Read in this context, we do not think *Green* and *Sanchez* support the broad proposition that any non-common carrier that performs the same basic function as a common carrier and exercises a similar degree of control over its passengers' safety must be held to the same duty of care that applies to common carriers.

¶ 26 Doe suggests that "in addition to the four [special relationships] that have been recognized, there may be other special relationships that give rise to a [heightened] duty." *Stearns v. Ridge Ambulance Service, Inc.*, 2015 IL App (2d) 140908, ¶ 18; see also Restatement (Second) of Torts § 314A cmt. b (1965) (four recognized relationships "are not intended to be exclusive,

- 7 -

and are not necessarily the only ones in which a duty of affirmative action for the aid or protection of another may be found"). But Doe cites no Illinois decision recognizing an additional special relationship. The only example the Restatement provides is "that of husband and wife," and it ultimately "expresses no opinion as to whether there may not be other relations which impose a similar duty." Restatement (Second) of Torts § 314A cmt. b & caveat (1965). In any event, Doe's reply brief makes clear that she is not asking us to recognize a new special relationship between ridesharing companies and their passengers. Instead, she seeks to extend the common carrier's duty of care to non-common carrier ridesharing companies under the reasoning of *Green* and *Sanchez*. As explained above, however, we do not think *Green* or *Sanchez* support her argument.

¶ 27    Even if there were support for the general proposition that common carrier liability may be extended to non-common carriers other than school bus operators, it would be inappropriate for us to extend such liability to transportation providers that the legislature has specifically declared are not common carriers, as the General Assembly did with respect to TNCs in section 25(e) of the Transportation Network Providers Act. "The fundamental rule of statutory interpretation is to ascertain and give effect to the legislature's intent, and the best indicator of that intent is the statutory language, given its plain and ordinary meaning." *Dew-Becker v. Wu*, 2020 IL 124472, ¶ 12. Section 25(e) states that TNCs "are not common carriers, *** as defined by applicable State law." 625 ILCS 57/25(e) (West 2018). Doe, in essence, would have us read section 25(e) as saying that TNCs are not common carriers *but are subject to the same duty of care applicable to common carriers*. But courts "are not free to read into a statute exceptions, limitations, or conditions the legislature did not express." *Dew-Becker*, 2020 IL 124472, ¶ 14. "No rule of construction authorizes this court to declare that the legislature did not mean what the plain language of the statute imports, nor may we rewrite a statute to add provisions or limitations the legislature did not include." *People v. Smith*, 2016 IL 119659, ¶ 28.

¶ 28    Were we to hold that TNCs are subject to the same liability standards as common carriers, it would strip the relevant language of section 25(e) of all meaning, contravening another rule of statutory construction that statutes "should be interpreted so that no part is rendered meaningless or superfluous." *People v. Simpson*, 2015 IL 116512, ¶ 29. If TNCs may be held to the same standards of liability as common carriers due to their similarity to common carriers, what does the legislative declaration that TNCs "are not common carriers" accomplish? The only suggestion Doe offers is that it frees TNCs from the common carrier's duty to serve the public indiscriminately. See *Rockdale School District*, 287 Ill. App. 3d at 794 ("A common carrier undertakes for hire to carry all persons indifferently who may apply for passage so long as there is room and there is no legal excuse for refusal." (Internal quotation marks omitted.)).

¶ 29    But a separate section of the Transportation Network Providers Act requires TNCs to "adopt and notify [their] drivers of a policy of non-discrimination on the basis of destination, race, color, national origin, religious belief or affiliation, sex, disability, age, sexual orientation, or gender identity with respect to passengers and potential passengers." 625 ILCS 57/20(a) (West 2018). The Act also requires TNC drivers to "comply with all applicable laws relating to accommodation of service animals" (*id.* § 20(c)) and forbids TNCs from "impos[ing] additional charges for providing services to persons with physical disabilities because of those disabilities" (*id.* § 20(d)). In addition, the Act provides that "[i]f a unit of local government has requirements for licensed chauffeurs not to discriminate in providing service in under-served areas, TNC drivers participating in TNC services within that unit of local government shall be

subject to the same non-discrimination requirements for providing service in under-served areas." *Id.* § 20(f).

¶ 30    Construing section 25(e) in conjunction with these additional provisions, as we must (see *People v. Jackson*, 2011 IL 110615, ¶ 12 ("A court must view [a] statute as a whole, construing words and phrases in light of other relevant statutory provisions and not in isolation.")), we think the Act does the opposite of what Doe suggests: it exempts TNCs from common carrier standards of liability but requires them to adhere to the common carrier's duty to serve all members of the public alike.

¶ 31    Finally, Doe correctly notes that "[c]ommon-law rights and remedies remain in full force in this state unless expressly repealed by the legislature or modified by court decision" and that "[a] legislative intent to alter or abrogate the common law must be plainly and clearly stated." *McIntosh v. Walgreens Boots Alliance, Inc.*, 2019 IL 123626, ¶ 30. She contends that section 25(e) does not clearly and expressly abrogate the common law rule that non-common carriers with sufficient similarities to common carriers are subject to the same standards of liability as common carriers. But as we explained above, there is no such general common law rule. By declaring that TNCs are not common carriers, section 25(e) clearly and expressly exempts TNCs from the standards of liability that apply to common carriers under the common law.

¶ 32                    B. Section 25(e) Does Not Violate the Special Legislation Clause

¶ 33    We now turn to the second certified question: Is the Transportation Network Providers Act constitutional? Because all statutes are presumed constitutional, the party challenging a statute's validity bears the burden of establishing a clear constitutional infirmity. *McElwain v. Office of the Illinois Secretary of State*, 2015 IL 117170, ¶ 14. The presumption of constitutionality also means that we must affirm the constitutionality of a statute whenever it is reasonably possible to do so. *Id.*

¶ 34    Doe contends that section 25(e) of the Act, as interpreted above to exempt ridesharing companies from common carrier liability, violates our state constitution's special legislation clause. That provision states: "The General Assembly shall pass no special or local law when a general law is or can be made applicable. Whether a general law is or can be made applicable shall be a matter for judicial determination." Ill. Const. 1970, art. IV, § 13. "The special legislation clause prohibits the General Assembly from conferring a special benefit or privilege upon one person or group and excluding others that are similarly situated." *Crusius v. Illinois Gaming Board*, 216 Ill. 2d 315, 325 (2005). "While the legislature has broad discretion to make statutory classifications, the special legislation clause prevents it from making classifications that arbitrarily discriminate in favor of a select group." *Id.* A special legislation clause challenge is thus judged under a two-part test: we first assess whether the statutory classification at issue discriminates in favor of a select group, and if we find that it does, we then determine whether the classification is arbitrary. *Id.*

¶ 35    We need not dwell on the first aspect of this inquiry. There is no question (and Lyft does not argue otherwise) that section 25(e) discriminates in favor of ridesharing companies *vis-à-vis* traditional taxicabs by exempting the former from the common carrier status that applies to the latter.

¶ 36    The operative question, then, is whether that legislative classification is arbitrary. This aspect of a special legislation clause challenge is judged under the same standards that apply to equal protection clause challenges under the federal or state constitution. *Id.* Where, as here,

the challenged statute does not involve a suspect classification or affect fundamental rights, we apply rational basis review. *Id.* Under that deferential review, we must uphold the constitutionality of a statute if the classification it draws is rationally related to a legitimate state interest. *Id.* Put differently, "we must determine whether the classifications created by [the statute] are based upon reasonable differences in kind or situation, and whether the basis for the classifications is sufficiently related to the evil to be obviated by the statute." *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 394 (1997). "In performing our analysis, we 'may hypothesize reasons for the legislation, even if the reasoning advanced did not motivate the legislative action.' " *Dotty's Cafe v. Illinois Gaming Board*, 2019 IL App (1st) 173207, ¶ 34 (quoting *People ex rel. Lumpkin v. Cassidy*, 184 Ill. 2d 117, 124 (1998)). Thus, if we "can reasonably conceive of any set of facts that justifies distinguishing the class the statute benefits from the class outside its scope, [we] will uphold the statute." *Crusius*, 216 Ill. 2d at 325.

¶ 37    Doe contends that there is no real and substantial difference between ridesharing companies and their traditional taxicab competitors that justifies treating only the latter as common carriers. In Doe's view, both are simply transportation companies in the business of selling rides to the public. But we think the General Assembly could rationally find that the different business model and technology employed by the ridesharing industry in delivering its services warrants the differing regulatory treatment.

¶ 38    Unlike traditional taxicabs, TNCs "use part-time drivers extensively." *Illinois Transportation Trade Ass'n*, 839 F.3d at 598. As Doe alleges in her complaint, Lyft's "business model depends on having a large pool of non-professional drivers to transport the general public." This model allows TNCs to dramatically expand the availability of on-demand transportation services to the public, particularly in areas that are not well served by traditional taxicabs. It also creates a "business relationship between TN[C]s and their drivers [that] differ[s] substantially from the one between [taxicab] medallion holders and taxicab chauffeurs." *Checker Cab Operators, Inc. v. Miami-Dade County*, 899 F.3d 908, 923 (11th Cir. 2018). One significant difference is that, as a matter of law, TNCs are "not deemed to own, control, operate, or manage the vehicles used by TNC drivers." 625 ILCS 57/5 (West 2018).

¶ 39    The technological platform that TNCs use to deliver their services also distinguishes them from their traditional taxicab competitors. Unlike taxis, TNC drivers may not accept passengers via street hail. See *id.* ("TNC service is not *** street hail service."). Instead, TNC service must be "prearranged [by a passenger] with a TNC driver through the use of a TNC digital network or software application," namely, a smartphone app. *Id.* This system allows TNCs, in comparison to taxicabs, to provide passengers with "more information in advance about their prospective rides—information that includes not only the driver's name but also pictures of him (or her) and of the car." *Illinois Transportation Trade Ass'n*, 839 F.3d at 598; see 625 ILCS 57/30(c) (West 2018) ("The TNC's software application or website shall display a picture of the TNC driver, and the license plate number of the motor vehicle utilized for providing the TNC service before the passenger enters the TNC driver's vehicle."). "In contrast, a customer who hails a taxi on the street may be able to observe the make and model of the vehicle, but does not know the driver's identity before he or she enters the vehicle." *Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 157 (3d Cir. 2018).

¶ 40    Doe contends that any distinction between TNCs and taxicabs based on the use of a smartphone app to prearrange rides is illusory because many taxicab companies have similar apps. But the critical distinction is that TNC service *must* be prearranged through a smartphone

- 10 -

app. Unlike taxis, TNC drivers are prohibited from accepting passengers via street hail. Doe also asserts that the distinction between arranging a ride via street hail and doing so via smartphone app is of no practical import because taxicab passengers receive similar information about their driver upon entering the cab. See 625 ILCS 55/5(a) (West 2018) ("The taxi driver's picture, the taxi driver's license or registration number, and the taxicab medallion number or an exterior identification number must be posted in a visible location in each cab."). But we cannot overlook the significance of TNC passengers receiving relevant information *before* they enter the vehicle, even if that amounts to a relatively short period of time in practice. "These few minutes give the [TNC] customer time to consider the available information before entering a vehicle, which is time that a taxi customer might not have." *Newark Cab Ass'n*, 901 F.3d at 158.

¶ 41        We think the General Assembly could reasonably conclude that TNCs' business model and technological platforms justify exempting them, but not traditional taxicabs, from common carrier status. In light of TNCs' extensive reliance on large networks of non-professional, part-time drivers, the General Assembly could reasonably conclude that holding those companies to principles of common carrier liability—including vicarious liability for intentional torts its drivers commit against passengers even if the drivers' conduct was outside the scope of their agency or employment—would be prohibitively burdensome for the industry. At the same time, the General Assembly could reasonably determine that the unique safety features enabled by TNCs' software technology and method of service make the imposition of such liability unnecessary for the protection of passengers.

¶ 42        Doe contends that section 25(e) is not rationally related to ensuring passenger safety, which she considers to have been the sole legislative purpose of the Transportation Network Providers Act. She asserts that section 25(e) is at odds with the remaining provisions of the Act, which promote the goal of passenger safety by (among other things) requiring TNCs and TNC drivers to maintain certain levels of automobile liability insurance coverage (625 ILCS 57/10 (West 2018)), setting minimal driver qualification requirements and mandating that drivers undergo criminal background checks (*id.* § 15), and requiring TNCs to implement zero-tolerance policies concerning the use of drugs or alcohol by drivers while logged in to the TNC network or providing TNC service (*id.* § 25(a)).

¶ 43        But a law need not be confined to a single purpose. "Legislation often has multiple purposes whose furtherance involves balancing and compromise by the legislature." *Crusius*, 216 Ill. 2d at 329. The Transportation Network Providers Act, "like most laws, might predominantly serve one general objective, *** while containing subsidiary provisions that seek to achieve other desirable (perhaps even contrary) ends as well, thereby producing a law that balances objectives but still serves the general objective when seen as a whole." *Fitzgerald v. Racing Ass'n of Central Iowa*, 539 U.S. 103, 108 (2003). We think that is precisely what the Transportation Network Providers Act did: it balanced the competing aims of ensuring the safety of TNC passengers and creating a regulatory environment that would allow the then-nascent ridesharing industry to flourish in Illinois, bringing added competition and innovation to the transportation services market. Section 25(e) will thus survive rational basis review so long as it rationally furthers at least one of these goals. See *Crusius*, 216 Ill. 2d at 329 ("For a

provision in a law to pass the rational basis test, it does not have to promote all of the law's disparate and potentially conflicting objectives."). [6]

¶ 44    The parties devote considerable attention to debating whether we may consider the legislative history of an earlier bill to regulate the ridesharing industry that the General Assembly passed (but the Governor vetoed) when determining the legislative purpose of the Transportation Network Providers Act. We need not resolve that question here, as its answer would be of academic interest only. When reviewing a statute under the rational basis test, a "court may hypothesize reasons for the legislation, even if the reasoning advanced did not motivate the legislative action." *Lumpkin*, 184 Ill. 2d at 124; see also *Federal Communications Comm'n v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993) (stating, in context of federal equal protection clause challenge, that "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature"). We may uphold section 25(e) if it is rationally related to the purpose of encouraging the growth of the ridesharing industry in order to foster competition in the transportation services market regardless of whether any legislator openly expressed that purpose at a committee hearing or in floor debate.

¶ 45    Recognizing the dual goals of the Transportation Network Providers Act, we have little difficulty in concluding that section 25(e)'s exemption of TNCs from common carrier status is rationally related to a legitimate state interest. Fostering competition in the transportation services market and increasing transportation options for consumers is undoubtedly a legitimate state interest. See *Moline School District No. 40 Board of Education v. Quinn*, 2016 IL 119704, ¶ 27 ("Encouraging Illinois businesses to expand in Illinois and facilitating economic growth of our communities are unquestionably legitimate functions of state government."). And the General Assembly could reasonably conclude that exempting TNCs from common carrier liability would facilitate their growth in the State. As explained above, the General Assembly could rationally conclude that holding TNCs to the common carrier standard of vicarious liability for their drivers' intentional torts against passengers, even if the driver's conduct fell outside the scope of the agency relationship, would unduly burden an emerging industry that relies to a large extent on non-professional and part-time drivers to increase the supply of on-demand transportation services available to the public. And as further explained, the General Assembly could rationally conclude that the safety features inherent in the technology that TNCs use to deliver their services provide additional protection for passenger safety and thus lessen the need to impose on TNCs the same degree of vicarious liability applicable to common carriers such as taxicabs. In our dissenting colleague's view, "the fact that the drivers are not professionals and are driving passengers part-time in their own vehicles would suggest that TNCs should be required to assume even *more* responsibility for them, not less, to ensure passenger safety in the hands of such drivers." (Emphasis in original.) *Infra* ¶ 69. But it is not for us to say whether section 25(e) is good policy or whether the

---

[6]Doe questions whether the now well-established ridesharing industry continues to need the particular regulatory rules established in the Transportation Network Providers Act. But under the rational basis test, we must judge the constitutionality of a statutory classification in light of the facts existing at the time of the statute's enactment. See *Chicago National League Ball Club, Inc. v. Thompson*, 108 Ill. 2d 357, 368-69 (1985) ("When a classification under a statute is called into question, if any state of facts can reasonably be conceived to sustain the classification, the existence of that state of facts at the time the statute was enacted must be assumed.").

Transportation Network Providers Act strikes the right balance between its competing goals of increased competition and passenger safety. "Our task is not to determine whether the statutory [provisions] are wise; our task is to determine whether they are constitutional." *Allen v. Woodfield Chevrolet, Inc.*, 208 Ill. 2d 12, 28 (2003).

¶ 46    In rejecting an equal protection clause challenge to a Chicago ordinance regulating TNCs and taxicabs differently—on matters of driver and vehicle qualifications, licensing, fares, and insurance—the Seventh Circuit concluded that "[t]here are enough differences between taxi service and TN[C] service to justify different regulatory schemes." *Illinois Transportation Trade Ass'n*, 839 F.3d at 598. Other federal courts have followed suit in rejecting equal protection challenges to similar ordinances. See *Newark Cab Ass'n*, 901 F.3d at 156-60; *Checker Cab Operators*, 899 F.3d at 921-24; *Progressive Credit Union v. City of New York*, 889 F.3d 40, 48-51 (2d Cir. 2018). Although these decisions do not address laws holding TNCs to a different standard of vicarious liability than taxicabs, their reasoning is equally applicable here. As the Seventh Circuit explained, "[d]ifferent products or services do not as a matter of constitutional law, and indeed of common sense, always require identical regulatory rules." *Illinois Transportation Trade Ass'n*, 839 F.3d at 598. For the reasons discussed above, we think the General Assembly could reasonably conclude that the differences between TNCs and taxicabs justify treating the two entities differently for purposes of imposing vicarious liability for the actions of their drivers and that the classification drawn by section 25(e) is rationally related to a legitimate state interest.

¶ 47    Finally, Doe argues that by exempting ridesharing companies but not traditional taxicab operators from common carrier status, section 25(e) arbitrarily distinguishes between victims of sexual assault by ridesharing drivers (who may not hold the driver's principal vicariously liable for the attack) and victims of sexual assault by taxicab drivers (who may). She asserts that this consequence of section 25(e) renders it unconstitutional under the special legislation clause. See *Best*, 179 Ill. 2d at 394 ("[I]n evaluating a challenged provision [under the special legislation clause] the court must consider the natural and reasonable effect of the legislation on the rights affected by the provision.").

¶ 48    In support of this argument, Doe compares section 25(e) to a statutory provision that our supreme court struck down in *Grasse v. Dealer's Transport Co.*, 412 Ill. 179 (1952). The provision at issue there transferred an injured employee's right to recover damages from his tortfeasor to the injured employee's employer if both the employer and the tortfeasor were covered by the Worker's Compensation Act. See *id.* at 181-82. As the court explained, the provision thus "modifie[d], and even eliminate[d] under some circumstances, the tort liability of third parties who negligently injure employees engaged in another enterprise." *Id.* at 191. The court held that the provision was unconstitutional special legislation in part because there was "no rational difference between an employee injured in the course of his employment by a [tortfeasor covered by the Act], and one injured by a [tortfeasor not covered by the Act]." *Id.* at 196. Rather, "[t]he sole basis for differentiation, as far as the injured employee [was] concerned, [was] a fortuitous circumstance—whether the third party tort-feasor happen[ed] to be [covered] under the [A]ct." *Id.*

¶ 49    The classification drawn by section 25(e) is not comparable to the one invalidated in *Grasse*. Whether a passenger is injured or attacked by a ridesharing driver rather than a taxicab driver does not result from happenstance but from the passenger's voluntary decision to use a ridesharing service rather than a taxi service. As our supreme court has explained, "relevant

- 13 -

differences in the circumstances under which *** various voluntary relationships [are] created" may "justif[y] the imposition of differing standards of care." *Grace v. Howlett*, 51 Ill. 2d 478, 488 (1972).

¶ 50    Contrary to the position of our dissenting colleague (see *infra* ¶ 67), we think the General Assembly could rationally conclude that differences in the manner in which TNCs and taxicabs form relationships with prospective passengers justify holding the respective entities to differing standards of care to their passengers. As discussed above, while a taxicab may respond to a prospective passenger's request for service via street hail, TNC service may only be prearranged between a passenger and driver using a TNC's smartphone app. See 625 ILCS 57/5 (West 2018). That technological innovation allows (and the Transportation Network Providers Act requires) TNCs to provide a prospective passenger with "a picture of the TNC driver[ ] and the license plate number of the motor vehicle utilized for providing the TNC service before the passenger enters the TNC driver's vehicle." *Id.* § 30(c). Thus, while a passenger who hails a taxi on the street "immediately is matched with a taxi when that taxi pulls over," a TNC passenger "is matched with [and provided information about] a driver a few minutes before the vehicle arrives," giving the TNC passenger "time to consider the available information before entering a vehicle." *Newark Cab Ass'n*, 901 F.3d at 158. As explained above, we think the General Assembly could rationally conclude that these features of TNC service (but not generally of taxicab service) create added protection for the safety of TNC passengers that justifies holding TNCs and taxicab operators to differing standards of care and, in particular, to differing degrees of vicarious liability for the intentional torts of their drivers against passengers.[7]

¶ 51                    C. The Enrolled-Bill Doctrine Forecloses Doe's
                                Three-Readings Rule Challenge

¶ 52    Doe's final contention is that the entire Transportation Network Providers Act is invalid under the Illinois Constitution's three-readings rule, which requires that "[a] bill shall be read by title on three different days in each house" before passage. Ill. Const. 1970, art. IV, § 8(d). As Doe explains, the Transportation Network Providers Act originated as House Amendment No. 1 to Senate Bill 2774 (SB 2774). See 98th Ill. Gen. Assem., Senate Bill 2774, 2013 Sess. SB 2774 initially passed the Senate and was read twice in the House as an unrelated bill to amend the Illinois Public Accounting Act (see 225 ILCS 450/0.01 *et seq.* (West 2018)). After its second reading in the House, SB 2774 was amended by removing everything after the enacting clause and substituting the text of what eventually became the Transportation Network Providers Act. The newly reconstituted SB 2774 was read once more before being passed by the House and then returned to the Senate where it was debated and passed the same day.

---

[7]Although section 25(e) exempts Lyft and other ridesharing companies from vicarious liability for their drivers' intentional torts that (like sexual assault) fall outside the scope of any agency relationship between the ridesharing company and its drivers, it does not similarly preclude Doe (and other ridesharing passengers) from recovering against a ridesharing company under theories of direct liability. In this case, Doe has also pleaded causes of action against Lyft for negligently hiring, retaining, and supervising McCoy and for fraudulently marketing itself as a safe transportation option. Those counts remain pending in the circuit court, and we express no opinion as to their merits.

- 14 -

¶ 53		Doe argues that the House improperly circumvented the three-readings rule by replacing the entirety of the then-twice read SB 2774 with a wholly unrelated amendment and reading the reconstituted bill just once before passage. In *Giebelhausen v. Daley*, 407 Ill. 25, 48 (1950), our supreme court held that the "complete substitution of a new bill under the original number, dealing with a subject which was not akin or closely allied to the original bill, and which was not read three times in each House, after it has been so altered, [was a] clear violation of" a similar three-readings rule in the 1870 Constitution. See Ill. Const. 1870, art. IV, § 13 ("Every bill shall be read at large on three different days, in each house ***.").

¶ 54		Doe contends that the procedure employed by the legislature here likewise violated the three-readings rule of our current constitution. But our supreme court has held that judicial challenges to legislation under the 1970 Constitution's three-readings rule are foreclosed by the enrolled-bill doctrine. See *Geja's Cafe v. Metropolitan Pier & Exposition Authority*, 153 Ill. 2d 239, 258-60 (1992). "That doctrine flows out of the language in article IV, section 8(d), which says '[t]he Speaker of the House of Representatives and the President of the Senate shall sign each bill that passes both houses to certify that the procedural requirements for passage have been met.' " *Id.* at 258-59 (quoting Ill. Const. 1970, art. IV, § 8(d)). Under the enrolled-bill doctrine, "once the Speaker of the House of Representatives and the President of the Senate certify that the procedural requirements for passing a bill have been met, a bill is conclusively presumed to have met all procedural requirements for passage." *Friends of the Parks v. Chicago Park District*, 203 Ill. 2d 312, 328-29 (2003). The doctrine thus "precludes [courts] from inquiring into the legislature's compliance with the procedural requirements for passage of bills." *People v. Dunigan*, 165 Ill. 2d 235, 253 (1995).

¶ 55		Doe recognizes that we are bound to reject her three-readings rule challenge under the enrolled-bill doctrine. But she argues that it is time to abandon the doctrine and presents the issue to preserve it for further review by the supreme court. As Doe notes, the supreme court has lamented the General Assembly's "remarkably poor self-discipline in policing itself in regard to the three-readings requirement" (*Friends of the Parks*, 203 Ill. 2d at 329) and has "reserve[d] the right to revisit" the enrolled-bill doctrine if the legislature's noncompliance persists (*Geja's Cafe*, 153 Ill. 2d at 260). Whether that time has come is a question only the supreme court can answer. Doe has appropriately preserved the issue for that court's review. But until the supreme court instructs otherwise, we must reject her three-readings rule challenge.

¶ 56						III. CONCLUSION

¶ 57		For the reasons discussed, we answer the circuit court's certified questions as follows: (1) section 25(e) of the Transportation Network Providers Act precludes TNCs from being subject to the heightened duty of care and special standards of vicarious liability that apply to common carriers and (2) neither the Act as a whole nor section 25(e), as interpreted, is unconstitutional. Accordingly, we affirm the circuit court's order dismissing Doe's vicarious liability claims and remand for further proceedings consistent with this opinion.

¶ 58		Affirmed and remanded; certified questions answered.

¶ 59   PRESIDING JUSTICE GORDON, concurring in part and dissenting in part:

¶ 60   I agree with the majority's answer to the first certified question, concerning whether section 25(e) of the Transportation Network Providers Act (Act) (625 ILCS 57/25(e) (West 2018)) exempts ridesharing companies from the heightened duty of care and standard of vicarious liability that apply to common carriers. However, I cannot agree with the majority's conclusion that section 25(e) is constitutional, and consequently, I respectfully dissent from the majority's answer to the second certified question.

¶ 61   Under our state's constitution, "[t]he General Assembly shall pass no special or local law when a general law is or can be made applicable. Whether a general law is or can be made applicable shall be a matter for judicial determination." Ill. Const. 1970, art. IV, § 13. This provision is commonly known as the special legislation clause, and it prohibits the legislature from conferring a special benefit or privilege upon one person or group and excluding others that are similarly situated. *Moline School District No. 40 Board of Education v. Quinn*, 2016 IL 119704, ¶ 18. "Its purpose, as [the supreme court has] consistently held, is to prevent arbitrary legislative classifications that discriminate in favor of a select group without a sound, reasonable basis." *Moline School District No. 40*, 2016 IL 119704, ¶ 18 (citing *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 391 (1997)).

¶ 62   In assessing whether a statute violates the special legislation clause, courts apply a two-part analysis: "First, they must determine whether the statutory classification at issue discriminates in favor of a select group. If it does, then they must go on to consider whether the classification is arbitrary." *Moline School District No. 40*, 2016 IL 119704, ¶ 23 (citing *Big Sky Excavating, Inc. v. Illinois Bell Telephone Co.*, 217 Ill. 2d 221, 235 (2005)). As the majority notes, there is no dispute that section 25(e) discriminates in favor of ridesharing companies by exempting them from common-carrier liability. Accordingly, the only question is whether the classification is arbitrary. It is here that the majority and I part ways.

¶ 63   A special legislation challenge is generally judged under the same standards applicable to an equal protection challenge. *Moline School District No. 40*, 2016 IL 119704, ¶ 24. If a law does not affect fundamental rights or make a suspect classification, "the appropriate measure of its constitutionality is the rational basis test, which asks whether the statutory classification is rationally related to a legitimate state interest." *Moline School District No. 40*, 2016 IL 119704, ¶ 24 (citing *Crusius v. Illinois Gaming Board*, 216 Ill. 2d 315, 325 (2005)). In applying such a test, "we must determine whether the classifications created by [the statute] are based upon reasonable differences in kind or situation, and whether the basis for the classifications is sufficiently related to the evil to be obviated by the statute." *Best*, 179 Ill. 2d at 394 (citing *Grasse v. Dealer's Transport Co.*, 412 Ill. 179, 195 (1952)). "[I]n evaluating a challenged provision the court must consider the natural and reasonable effect of the legislation on the rights affected by the provision." *Best*, 179 Ill. 2d at 394 (citing *Grasse*, 412 Ill. at 193).

¶ 64   As an initial matter, it is important to note that Doe is challenging only one section of a larger statute; she is not contending that the Act as a whole constitutes special legislation but only that section 25(e) does. To be clear: while courts in other jurisdictions have considered equal protection challenges to statutes regulating TNCs, this is the first case addressing a special legislation challenge, as well as the first case considering the provision exempting TNCs from common-carrier liability. This distinguishes the case at bar from the cases in other jurisdictions, on which Lyft and the majority rely. It also focuses the inquiry before this court to one question: does exempting TNCs from common-carrier liability violate the special

legislation clause? I would find that it does because there is no rational basis for treating a TNC differently than a taxicab with respect to the duty owed to its passengers. In fact, not only does section 25(e) treat TNCs differently than taxicabs, but it treats TNCs differently than *any* other entity that would fall within the definition of a common carrier.

¶ 65 Under Illinois law, "a common carrier is 'one who undertakes for the public to transport from place to place such persons or the goods of such persons as choose to employ him for hire.' " *Browne v. SCR Medical Transportation Services, Inc.*, 356 Ill. App. 3d 642, 646 (2005) (quoting *Illinois Highway Transportation Co. v. Hantel*, 323 Ill. App. 364, 374 (1944)). Additionally, a common carrier must hold itself out to provide its services to the general public. *Ally Financial Inc. v. Pira*, 2017 IL App (2d) 170213, ¶ 46. A common carrier " 'undertakes for hire to carry all persons indifferently who may apply for passage so long as there is room and there is no legal excuse for refusal.' " *Browne*, 356 Ill. App. 3d at 646 (quoting *Hantel*, 323 Ill. App. at 376).

¶ 66 The heightened duty of care owed by a common carrier existed at common law and is not a creation of statute, a factor that our supreme court has found relevant in determining whether the legislature could impose limits on liability. See, *e.g.*, *Wright v. Central Du Page Hospital Ass'n*, 63 Ill. 2d 313, 329 (1976) ("Although we do not hold or even imply that under no circumstances may the General Assembly abolish a common law cause of action without a concomitant *quid pro quo*, we have consistently held that to the extent that recovery is permitted or denied on an arbitrary basis a special privilege is granted in violation of the Illinois Constitution."). Thus, the fact that the legislature has chosen to regulate TNCs and taxicabs differently in certain respects is not the relevant issue. Instead, the issue is that the legislature has chosen to exempt TNCs from a common-law duty that applies to taxicabs and other common carriers.

¶ 67 While the majority focuses on the differences between TNCs and taxicabs, the real difference that section 25(e) makes is in the relief available to the victims of crimes such as the sexual assault at issue here. Under section 25(e), victims of crimes that were committed by drivers of TNCs are basically prohibited from obtaining relief for acts of sexual predators, unlike victims of crimes that were committed by drivers of common carriers, such as taxicabs. The majority finds this distinction immaterial, concluding that "[w]hether a passenger is injured or attacked by a ridesharing driver rather than a taxicab driver does not result from happenstance but from the passenger's voluntary decision to use a ridesharing service rather than a taxi service. As our supreme court has explained, 'relevant differences in the circumstances under which *** various voluntary relationships [are] created' may 'justif[y] the imposition of differing standards of care.' " *Supra* ¶ 49 (quoting *Grace v. Howlett*, 51 Ill. 2d 478, 488 (1972)). However, unlike the majority, I find no relevant differences in the circumstances under which a passenger takes a rideshare as opposed to taking a taxicab, so the mere fact that a passenger chose one form of transportation over the other should have no effect on the relief she is entitled to seek in court.

¶ 68 Additionally, the case that our supreme court was discussing in *Grace*, *Delany v. Badame*, 49 Ill. 2d 168 (1971), is a case in which the court upheld the constitutionality of a "guest statute," which increased the degree of fault required for a plaintiff to recover against the driver of a motor vehicle in which he was a passenger. The Delany court noted that the purpose of the statute was to "protect the interest of those who gratuitously extend the hospitality of their motor vehicles," and found unpersuasive the plaintiff's attempt to analogize the driver to the

owner of a motorboat or home. *Delany*, 49 Ill. 2d at 171-72. The court, however, expressly noted that "the guest statute does not preclude a cause of action to the injured party but changes the degree of fault necessary for a recovery from that of the common law." *Delany*, 49 Ill. 2d at 174. In the case at bar, by contrast, section 25(e) operates to preclude a cause of action to the injured party by exempting TNCs from the duty they would otherwise owe their passengers.

¶ 69   The majority finds that "[i]n light of TNCs' extensive reliance on large networks of non-professional, part-time drivers, the General Assembly could reasonably conclude that holding those companies to principles of common carrier liability *** would be prohibitively burdensome for the industry." *Supra* ¶ 41. I find the opposite—the fact that TNCs rely on non-professional, part-time drivers demonstrates that it is *unreasonable* for the General Assembly to weaken the protections given to the passengers of the TNCs. If anything, the fact that the drivers are not professionals and are driving passengers part-time in their own vehicles would suggest that TNCs should be required to assume even *more* responsibility for them, not less, to ensure passenger safety in the hands of such drivers. There is simply no rational reason to permit a company to be shielded from liability that it would otherwise be required to assume where that company is providing common-carrier services to passengers but is doing so through the use of individuals who are not full-time employees, who are not professionals, and who are largely using their own vehicles.

¶ 70   Most importantly, the Constitution of the State of Illinois was adopted for a number of reasons, including "to provide for the health, safety and welfare of the people" and to "assure legal, social and economic justice." Ill. Const. 1970, pmbl. Section 25(e) violates both of these reasons. By exempting ridesharing companies from the heightened duty of care and the standard of vicarious liability that apply to common carriers, the legislature has totally disregarded the health, safety, and welfare of the people who would utilize the services of the ridesharing companies. Since the ridesharing companies would basically be immune from suit from the physical and mental injuries that stem from the evil deeds of sexual predators, the background checks that the companies are required to make would not be of the magnitude that they would be if liability would attach as a result of their negligence.

¶ 71   The largest expense for a common carrier is usually what they pay for liability insurance. Taxi companies pay large rates for their drivers, or over and above what the drivers pay, because of the taxicab companies' exposure to liability for their drivers' wrongful acts. As a result of section 25(e), the ridesharing companies would have little or no liability due to the common-carrier exclusion given to them, and their insurance rates would reflect that advantage, causing the taxicab charges to be substantially greater than those of the ridesharing companies.

¶ 72   In addition, section 25(e) not only fails to assure legal, social, and economic justice, it creates an unjust result to the victims of sexually predatory drivers who use the services of ridesharing companies relying on their advertisements that they will have a safe ride. For all of the reasons stated herein, I find that the statutory exclusion at issue in section 25(e) discriminates in favor of ridesharing companies to the detriment of the taxicab companies and the people of the State of Illinois, and that the classification is arbitrary and thus violates the special legislation clause of the Illinois Constitution. Accordingly, for all of the reasons stated in this dissent, I would find that section 25(e) is unconstitutional and would answer the second certified question in the affirmative.